819 A.2d 1158

**John P. SAADEH**

v.

**SAADEH, INC., et al.**

**No. 92 Sept. Term, 2002.**

Court of Special Appeals of Maryland.

March 28, 2003.

306

Gregory J. Swain (The Swain Law Group, LLC, on the brief) Annapolis, for appellant.

Steven E. Schenker (Herwig & Humphreys, LLP, on the brief) Baltimore, for appellees.

Argued before KENNEY, DEBORAH S. EYLER, CHARLES E. MOYLAN JR., (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

The Circuit Court for Anne Arundel County granted a motion for judgment in favor of Saadeh, Inc., and its workers' compensation insurer, Ohio Casualty Insurance Company ("Ohio Casualty"), the appellees, at a bench trial of a workers' compensation case brought by John P. Saadeh, the appellant. The court found that, on the evidence presented, a person the appellant alleged was a third-party joint tort-feasor liable for injuries the appellant sustained in the course of his employment was not liable; and therefore, the appellant's settlement with another third party with respect to the same injuries

completely resolved his only third-party tort claim. The court ruled that, because the appellant had accepted the settlement before he filed a workers' compensation claim, and had done so without the knowledge or approval of Ohio Casualty, he had elected a tort remedy and was barred, under Md.Code (1999 Repl. Vol.) section 9–901 of the Labor and Employment Article ("LE"), from receiving workers' compensation for the same injuries.

On appeal, the appellant presents one question, which we have reworded:

Did the trial court err in concluding that the alleged joint tort-feasor was not liable for the appellant's injuries?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

The appellant and his wife own the appellee company, Saadeh, Inc., which for ten years owned and operated a restaurant in Annapolis trading under the name "Jo's Deli." The appellant worked full time at the deli.

On July 28, 1996, the appellant was waiting on a customer named Louis Ravenet, Jr., who was present in the deli with his wife and his father, Louis Ravenet, Sr.[1] Junior became irate over a food order. When the appellant tried to calm him down, Junior became more angry and then refused to leave, even though it was closing time. The situation escalated and culminated in Junior's punching the appellant in the face, breaking his nose, and inflicting other injuries on him. The police were called and Junior was arrested and charged with disorderly conduct, trespassing, and assault and battery.

The appellant underwent surgery to repair his broken nose. He remained under a doctor's care for several months for the injuries he sustained in the July 28, 1996 incident.

---

1. To avoid some awkward syntax, we shall refer to Louis Ravenet, Jr., as "Junior," and Louis Ravenet, Sr., as "Senior."

Trial on the charges against Junior was scheduled for December 23, 1996. That day, Junior and the State reached an agreement to place the case on the "stet docket," under Rule 4–248. That agreement in turn was based on a settlement between the appellant and Junior that called for the appellant to release his claims and causes of action arising out of the July 28, 1996 incident in exchange for a promise by Junior to pay him $50,000, in equal installments, over a 14–month period. On January 15, 1997, the appellant and Junior committed their settlement agreement to writing.[2]

At the time that the appellant entered into the settlement with Junior he had not yet filed a claim for workers' compensation in connection with the July 28, 1996 incident (and may not have planned to do so). It is undisputed that the appellant entered into the settlement agreement without Ohio Casualty's knowledge or approval.

On April 14, 1997, three months after signing the settlement agreement with Junior, the appellant suffered a spontaneous dissection of the right carotid artery, which produced serious medical complications. He and his treating doctors maintain that this condition resulted from the July 28, 1996 attack.

On August 27, 1997, the appellant filed a claim with the Workers' Compensation Commission ("Commission") in connection with the July 28, 1996 incident. The appellees contested the claim. On December 1, 1997, a merits hearing was held. Thereafter, on June 25, 1998, the Commission issued a decision finding that the appellant's claim was barred under the election of remedies doctrine, as embodied in LE section 9–901.

The appellant filed an action for judicial review in the Circuit Court for Anne Arundel County. The parties filed cross-motions for summary judgment. At the hearing on the motions, the appellant argued that he should not be deemed to have elected a tort remedy because he still had a viable tort

---

2. Unfortunately, the settlement agreement is not in the record and was never moved into evidence in any of the proceedings below.

claim against Senior. The appellant argued that Senior was a third-party joint tort-feasor who shared legal responsibility with Junior for the injuries inflicted on July 28, 1996.

On March 16, 1999, the circuit court remanded the case to the Commission to determine two issues: first, whether Junior had fully paid in accordance with the settlement agreement so as to have been released from liability; and second, if so, whether "one or more additional joint tort-feasors [were] available to reimburse [the appellees] via subrogation?" The court's order directed that "[i]f there are no surviving or identifiable joint tort-feasors who also may be held liable, then [Junior's] full release would constitute an election of remedies and a final bar to the [appellant's] Workers' Compensation Claim."

On July 26, 1999, the appellant filed a tort action against Senior in the Circuit Court for Baltimore County, for damages for the injuries he suffered in the July 28, 1996 incident. To date, Senior has not been served with process in that case. The case remains pending, however.

On remand, the Commission held an evidentiary hearing, on January 12, and April 10, 2000. The parties stipulated that Junior in fact had made all the required payments under his settlement agreement with the appellant and therefore was released from all liability in connection with the incident of July 28, 1996. On April 13, 2000, the Commission issued a decision making that finding, and further finding that "[t]here are no surviving or identifiable joint tort-feasors who also may be liable." On that basis, the Commission once again concluded that the appellant's compensation claim was barred under LE section 9–901.

The appellant filed a second action for judicial review in the Circuit Court for Anne Arundel County.

A bench trial commenced on January 23, 2002. Pursuant to an agreement of counsel, the sole issue for decision was whether the appellant was barred by the election of remedies doctrine from receiving compensation under the Act. The appellant called three witnesses, each of whom had observed

the altercation or part of it: William Gibbs, an employee of Jo's Deli; Edward Timnivliouglou, the owner of a neighboring business; and Belle Pollack, a deli customer.

At the conclusion of the appellant's case, the appellees moved for judgment. After hearing argument of counsel, the trial court reviewed the evidence, made findings of fact, and found that there was no basis for joint tort-feasor liability on the part of Senior. On that ground, the court ruled that by settling with Junior the appellant had elected a tort remedy and was barred from recovering compensation under the Act.

On March 6, 2002, the court issued an order memorializing its ruling. The order granted the appellees' motion for judgment, affirmed the Commission's order of April 13, 2000, and stated "there are no surviving or identifiable joint tort-feasors who also may be liable; accordingly, the [appellant's] release constitutes an election of remedies and a final bar to his workers' compensation claim."

The appellant noted a timely appeal.

We shall recite additional facts in our discussion of the question presented.

## DISCUSSION

Under LE section 9–901, entitled "Choice of proceeding against third party or employer[,]"

[w]hen a person other than an employer is liable for the injury ... of a covered employee for which compensation is payable under this title, the covered employee ... may:

(1) file a claim for compensation against the employer under this title; or

(2) bring an action for damages against the person liable for the injury ... or, in the case of joint tort-feasors, against each joint tort-feasor.

■ The Court of Appeals has held that this statute permits a covered employee to obtain compensation under the Workers' Compensation Act, LE sections 9–101, *et seq.*, and then pursue a tort claim against a third-party tort-feasor; or

to simultaneously pursue compensation and a tort action. *Franch v. Ankney,* 341 Md. 350, 670 A.2d 951 (1996); *Perdue v. Brittingham,* 186 Md. 393, 47 A.2d 491 (1946). The employee may not, however, pursue a tort remedy to conclusion and then file and obtain compensation. *Johnson v. Miles,* 188 Md. 455, 53 A.2d 30 (1947); *Central GMC, Inc. v. Lagana,* 120 Md.App. 195, 706 A.2d 639, *cert. granted,* 350 Md. 280, 711 A.2d 871, *appeal dismissed,* 351 Md. 160, 717 A.2d 384 (1998).[3]

LE section 9–901 is logically related to the two statutory sections that follow it. LE section 9–902, entitled "Action against third party after award or payment of compensation[,]" establishes a subrogation scheme. It allows that when compensation has been awarded or paid to a covered employee, the insurer "may bring an action for damages against the third party who is liable for the injury ... [to] the ... employee[,]" LE section 9–902(a), and further directs that if the damages the insurer recovers in the third-party action exceed the amount of compensation it has paid, then after deducting the costs and expenses of the action, it must pay the balance over to the employee.[4] LE section 9–902(b).

■ For two months after the first award of compensation, the insurer's right to bring a third-party action is exclusive. LE section 9–902(c). Thereafter, the insurer and the employee share that right. If the employee brings suit and is awarded damages, then, after deducting the costs and expenses of the action, he must reimburse the insurer for the compensation it has paid under the Act; the employee then may keep the balance of damages recovered. LE section 9–902(e). Thus, whether the third-party action is brought by the

**3.** It is undisputed that the appellant is a "covered employee for which compensation is payable," within the meaning of LE section 9–901. Henceforth in this opinion, we shall use the term "employee" to mean "covered employee," for ease of discussion.

**4.** The statute also gives the right to bring such a cause of action to the self-insured employer, the Subsequent Injury Fund, or the Uninsured Employers' Fund. In the case at bar, the employer was insured, and therefore for clarity we shall refer only to the right of the insurer to bring a third-party action.

insurer or the employee, the insurer is entitled to recoup from the tort-feasor the compensation it has paid.

■ The insurer's right of subrogation against a third party responsible for the employee's injury exists apart from the Act; but the Act creates a method for enforcing it. *Western Maryland R. Co. v. Employers' Liab. Assurance Corp.,* 163 Md. 97, 102, 161 A. 5 (1932). The Court of Appeals has held that when compensation has been awarded or paid, thus giving rise to a subrogation right in the insurer, the insurer is entitled to participate in the decision to settle a third-party claim asserted by the employee, and the third party may not settle separately with the employee without the acquiescence of the insurer. *Id.*

LE section 9–903, entitled, "Effect of receipt of amount in action," provides that, when an employee has made a workers' compensation claim and subsequently receives a damages award in a third-party action, then with one exception the damages award is in place of any compensation award the employee could receive under the Act, and his compensation case is finally closed and settled. The exception arises when the damages award is less than the amount of compensation the employee would be entitled to receive under the Act. In that situation, the employee can reopen his compensation claim and recover the difference between the amount of damages he received and the full amount of compensation payable under the Act.

In *Franch v. Ankney, supra,* 341 Md. 350, 670 A.2d 951, the Court of Appeals addressed a situation in which an employee made a claim for workers' compensation, and was receiving benefits, and then asserted a tort claim against a third party allegedly liable for the employee's on-the-job injury. The employee entered into a settlement with the third party, but did not notify her workers' compensation insurer or obtain its consent. The Commission ruled that the settlement fully relieved the insurer of any obligation to pay additional benefits.

In the context of a malpractice suit against a lawyer who advised the employee not to appeal the Commission's decision, the Court held that, even though the employee should not have settled the third-party claim without the insurer's approval, her doing so did not preclude her from receiving additional compensation. Instead, it had the effect of reducing the compensation she was entitled to by an amount equal to that by which the unauthorized settlement had prejudiced the insurer's subrogation right. The Court explained that that sum would be the amount of the settlement plus any difference between the settlement amount and the value of a reasonable settlement that could have been obtained had the insurer been afforded the opportunity to participate in the settlement negotiations.

The Court stated:

The [insurer's] rights in the claim against the third party are only those derived through the employee. Pursuant to general principles of subrogation law, therefore, if an injured employee settles the claim and releases the third party tort-feasor from liability, the [insurer's] ability to pursue the claim against the tort-feasor is extinguished. Thus, a *de minimis* settlement between the employee and the tort-feasor could prejudice the [insurer's] interest by depriving the [insurer] of its ability to obtain reimbursement equal to the full value of the third party claim.... Therefore, an employee should notify the ... insurer when making a claim against a third party and when contemplating any settlement, especially when the settlement is substantially below the amount of workers' compensation benefits paid or payable by the ... insurer....

"[A]n unauthorized third-party settlement does not, in itself, constitute grounds for the termination" of benefits. Rather, ... the [insurer] is entitled to reimbursement from the proceeds of the settlement as the statute provides.... See LE 9–902(e). Additionally, ... if the [insurer] can establish that it has been prejudiced by the settlement, i.e., because the reasonable dollar value of the third party claim might have been significantly greater than the amount of the

actual unauthorized settlement and the settlement was less than the workers' compensation benefits, then the [insurer] is also entitled to a credit for the amount of the prejudice.... [I]n cases where the total amount of the credits due the [insurer] because of the unauthorized settlement exceeds the amount of future benefits that would be due the employee, the employee's benefits could be terminated.

*Id.* at 358–60, 670 A.2d 951 (quoting *Ankney v. Franch,* 103 Md.App. 83, 109, 652 A.2d 1138 (1995)) (other citations omitted) (footnotes omitted).

In *Central GMC, Inc. v. Lagana, supra,* 120 Md.App. 195, 706 A.2d 639, the injured employee entered into a settlement with the third party who had caused her on-the-job injury. She did so before filing a compensation claim, and without notifying or receiving authorization from her workers' compensation insurer. When the employee later filed a compensation claim, the Commission ruled it was barred under the election of remedies doctrine. In affirming that decision, this Court explained that the employee's settlement extinguished the subrogation right the insurer would have against the third party if the insurer later paid compensation. Because entering into a settlement that extinguished the insurer's subrogation right was inconsistent with the employee's later receiving compensation that the insurer would be entitled to recover via subrogation, the employee was deemed to have elected the tort remedy in place of the compensation remedy, and therefore could not obtain compensation. *See Surratts Associates v. Prince George's County,* 286 Md. 555, 568, 408 A.2d 1323 (1979) (explaining that among elements of election of remedies doctrine are "(1) two or more coexisting remedies between which there is a right of election; (2) inconsistency as to such available remedies; and (3) the actual bringing of an action and pursuing it to a final judgment.").

The Court in *Lagana* stressed that the terms "election of remedies" and "impairment of subrogation interests" were not "co-extensive." 120 Md.App. at 212, 706 A.2d 639. The doctrine of election of remedies comes into play when,

*prior to* bringing a workers' compensation claim, the injured worker settles with a third-party tort-feasor (*id.* at 208–09, 706 A.2d 639); on the other hand, the issue of whether the insurer's right to subrogation has been impaired arises when, in cases like *Franch,* an employee settles with a third-party tort-feasor *after* a workers' compensation claim has been filed. *Id.* at 209–10, 706 A.2d 639. Settlement of a claim against the sole third-party tort-feasor prior to the filing of a workers' compensation claim constitutes a binding election of remedies and extinguishes the insurer's duty to pay the compensation claim, whereas an unauthorized settlement with a third-party tort-feasor *after* a workers' compensation claim has been brought (as in *Franch*) simply results in decreasing the amount the employee is entitled to recover in his compensation claim by a sum equal to the impairment. *See Central GMC, Inc. v. Lagana, supra,* 120 Md.App. at 205–06, 706 A.2d 639.

In the case at bar, the parties agree that, under the holdings discussed above, if Junior were the only third party responsible for the appellant's injuries, then by settling with him before filing a compensation claim and without giving notice to or obtaining consent from Ohio Casualty, the appellant would have extinguished, in advance, the subrogation right Ohio Casualty would have if it were to pay workers' compensation on a later-filed claim. Therefore, if that were the case, the appellant would have been deemed to have elected a tort remedy and would have been barred from receiving compensation under the Act.

The parties' differences of opinion stem from the possibility that there were two third-party tort-feasors jointly responsible for the appellant's injuries—Junior, the primary joint tort-feasor, and Senior, an aider and abettor, and thus also a joint tort-feasor. The appellant points out that LE section 9–901(2) provides that an employee may bring a third-party action against "each joint tort-feasor," when joint tort-feasors are liable for his injury.

The situation gives rise to several related questions. First, if Senior and Junior were joint tort-feasors with respect to the appellant's injuries, and if even after the appellant's settlement with Junior, a tort remedy still could be pursued and obtained against Senior, did the settlement with Junior operate as an election of a tort remedy? Second, in what forum and when is the joint tort-feasor status of Senior to be decided? Third, if the circuit court in the compensation case was a proper body to decide Senior's tort-feasor status, was its finding that Senior was *not* a joint tort-feasor legally correct and supported by non-clearly erroneous factual findings? And finally, if so, did the court properly conclude that the appellant's settlement with Junior was a final resolution of his only possible third-party tort claim that extinguished, in advance, any subrogation right that Ohio Casualty would acquire upon paying workers' compensation, and therefore precluded him from obtaining compensation under the election of remedies doctrine?

On the first question, we conclude that the governing statutes and the holdings in *Franch* and *Lagana* dictate that, if there was a viable third-party damages claim against Senior, as a joint tort-feasor, after the appellant entered into his settlement agreement with Junior, and after he filed his compensation claim, the settlement did not necessarily preclude the appellant from obtaining workers' compensation.

■ As a subrogee, a workers' compensation insurer's subrogation right against each third-party tort-feasor jointly responsible for the employee's injury is derivative of the employee's rights against each such tort-feasor. *Montgomery County v. Valk Mfg. Co.,* 317 Md. 185, 190, 562 A.2d 1246 (1989) (citing *Ennis v. Donovan,* 222 Md. 536, 540, 161 A.2d 698 (1960)(quoting *Baltimore Transit Co. v. State ex rel. Schriefer,* 183 Md. 674, 679, 39 A.2d 858 (1944))).

■ Under the Maryland Uniform Contribution Among Joint Tort Feasors Act, Md.Code (2002 Repl.Vol.), section 3–1401 *et seq.,* of the Courts & Judicial Proceedings Article ("CJ"), an employee's release of one third-party joint feasor

does not discharge the liability of the other (or others) unless the release so provides. CJ § 3–1404. Instead, depending on the language used in the release, and assuming that the settling wrongdoer's tort-feasor status is established either by agreement in the release or by adjudication, a judgment against a joint tort-feasor will be reduced by the sum paid for the release, unless a different reduction formula was agreed upon and stated in the release. *Id.; Porter Hayden Co. v. Bullinger,* 350 Md. 452, 470, 713 A.2d 962 (1998); *Jacobs v. Flynn,* 131 Md.App. 342, 375, 749 A.2d 174, *cert. denied sub nom., Kishel v. Jacobs,* 359 Md. 669, 755 A.2d 1140 (2000); *Jones v. Hurst,* 54 Md.App. 607, 608, 459 A.2d 219 (1983). Accordingly, so long as there is a viable tort claim against a putative joint tort-feasor for damages for the employee's injuries, it is not established that the insurer's future subrogation right has been extinguished by the employee's unauthorized, pre-claim settlement with another joint tort-feasor.

Upon the award or payment of workers' compensation, the insurer may proceed in tort against a second putative joint tort-feasor; and after two months, the employee also may do so if the insurer has not. Any judgment entered against the third-party joint tort-feasor will be for the full amount of damages, because there is but a single injury suffered by the employee. *Maryland Lumber Co. v. White,* 205 Md. 180, 199, 107 A.2d 73 (1954) (Maryland Uniform Contribution Among Tort Feasors Act did not change common law rule that a plaintiff is entitled to but one satisfaction for tort injury); *see also Hartlove v. Bedco Mobility, Inc.,* 72 Md.App. 208, 212, 527 A.2d 1342 (1987) (explaining that plaintiff can pursue joint tort-feasors segmentally, until there is a judgment rendered). The judgment will be taken subject to the insurer's subrogation interest, under LE section 9–902. In addition, the judgment will be reduced by the amount paid by the settling third-party joint tort-feasor, or by an amount or share designated in the release between that joint tort-feasor and the employee. Depending on the amount of the judgment and the sum by which it is to be reduced, the insurer's subrogation interest might be impaired; to the extent it is, the compensation the

employee will be entitled to will be reduced. In that situation, however, the insurer's subrogation right will not have been extinguished.

The *insurer* can protect *its subrogation right* by bringing suit against the second putative joint tort-feasor and/or by participating in any settlement negotiations in a suit by the employee against that person. Thus, the insurer's subrogation right will be protected in any settlement entered into.

■ If the case against the putative second joint tort-feasor is tried and results in a defense verdict, it is then established that the only third-party wrongdoer against whom recovery was possible was the third party with whom the employee settled, pre-claim and without authorization; and that the insurer's subrogation right has been extinguished by that settlement. In that situation, unless the employee voluntarily pays over to the insurer the sum he recovered in the settlement, he is deemed to have elected his remedy. (If he turns over the settlement, then under *Franch*, he would have impaired the insurer's subrogation right to the extent the insurer could have recovered more, by settlement or verdict, than what was paid.)

We hasten to add that it is the extent of prejudice that drives the resolution of the election of remedies issue. The principle undergirding the decision in *Franch* is that the prejudice to the insurer's subrogation right must be complete for the doctrine of election of remedies to apply; if it is not, the prejudice to the insurer's subrogation right will be ameliorated by an offset against the amount of compensation due. There may be circumstances in which, even though the employee still has a viable claim against a non-settling putative third-party joint tort-feasor, his unauthorized settlement with another joint tort-feasor for all practical purposes will have eviscerated the insurer's subrogation right. In that situation, the subrogation right, being made useless, is effectively eliminated, and the employee will be deemed to have elected his tort remedy. *Cf. Noma Electric Corp. v. Fidelity & Deposit Co.*, 201 Md. 407, 411–12, 94 A.2d 277 (1953) (holding that

when two employees acted together to embezzle funds from insured employer, insured employer's settlement with one employee, who had assets, without the knowledge or consent of bonding company, released the bonding company from its obligation on the bond respecting the second, jointly responsible employee, who had no assets).

Here, if Junior and Senior both were liable in tort for the appellant's injuries, the appellant's unauthorized, pre-claim settlement with Junior would not have eliminated the subrogation right that would arise upon Ohio Casualty's paying workers' compensation benefits, because Senior would still be subject to liability. To be sure, in that circumstance, the settlement would impair Ohio Casualty's subrogation interest, and thus would result in a reduction of benefits. And depending upon the terms of the release given to Junior and other factors, such as whether Senior was judgment proof, the settlement may have had the practical effect of extinguishing Ohio Casualty's subrogation right. For our purposes, however, it is enough to say that so long as a tort claim against Senior potentially was viable, the settlement with Junior did not prejudice Ohio Casualty so completely as to operate as an election of remedies.

Although the appellant filed a tort action against Senior, the issue of Senior's tort-feasor status was decided not in that case but in the compensation case, first by the Commission and then by the circuit court on an "essentially de novo" review. *See Morris v. Bd. of Educ.,* 339 Md. 374, 378 n. 4, 663 A.2d 578 (1995); *Applied Indus. Techs. v. Ludemann,* 148 Md.App. 272, 282, 811 A.2d 845 (2002). Ordinarily, the tort action is the proper forum in which to determine, as a factual matter, the liability of a tort defendant; and in this case, the Baltimore County Circuit Court tort action would be the proper forum for adjudicating Senior's liability *vel non* to the appellant, *i.e.,* his tort-feasor status.

In ruling on a motion to preclude the award of benefits under LE section 9–901, however, the Commission properly may decide whether the claimant's settlement (or a judgment

he has obtained) was with (or against) the only tort-feasor responsible for his injury, and that no other putative joint tort-feasors exist, as a matter of law.  In other words, there is no reason the Commission (and the circuit court on review) should not address in the compensation case the purely legal question whether the evidence most favorable to the claimant could support a finding of tort liability against a person the claimant maintains is an additional tort-feasor;  or other legal bars to pursuing a claim against that person (for example, that any tort claim would be barred by limitations).  If the person's tort-feasor status is a question of fact, however, and a suit is pending against him, the Commission ordinarily should defer to the fact-finder in the tort case on that issue.

In the case at bar, the parties acquiesced in the Commission's deciding the tort-feasor status of Senior both as a matter of law *and* of fact.  Indeed, on appeal, neither party contends that the issue should not have been decided in that fashion;  or that, once the third-party action against Senior was filed, the Commission should have deferred deciding the election of remedies question until Senior's tort-feasor status was decided in the circuit court tort action.  Certainly, the Commission had jurisdiction to decide Senior's tort-feasor status;  so while deferring to the decision-maker in a co-existing tort action on the factual issue of tort-feasor status is most appropriate, the Commission had the power to make the decision itself, and acted properly in doing so without objection by any party.

As explained, the Commission determined that Senior was not liable in tort to the appellant; and on review, the circuit court reached the same conclusion.  Most of the appellant's argument on appeal is an attack on the court's finding on that issue.  The appellant maintains that the evidence adduced compelled a finding that Senior encouraged, incited, aided, or abetted Junior's attack, and therefore was himself liable in tort.  The appellees maintain the trial court made factual findings that were not clearly erroneous, and properly found Senior not liable on that basis.

The appellant's theory against Senior was that he aided and abetted his son in committing the battery by intervening when William Gibbs tried to break up the fight, thereby allowing the fight to continue.

At trial, Gibbs testified that on the day in question he was working at the deli making sandwiches. There was a mistake with one of the Ravenet party's sandwiches, which was promptly corrected. Junior became irate, however, and started screaming and yelling at the appellant. It was closing time, and the appellant tried to escort the Ravenet party out the door, mostly because Junior was continuing to make a scene. Senior, who appeared to be in his mid 60's, left, as did Junior's wife; both apologized to the appellant for Junior's conduct.

As the appellant was holding the door open for Junior to exit, Junior came face to face with him, continued to yell and scream and cause a commotion, and suddenly punched the appellant in the face. The two men fell backward into the deli, and an all-out brawl ensued, with the men on the floor, wrestling and hitting each other, falling over tables and chairs and against the wall, and blood coming from the appellant's face and going "everywhere."

At that point, and without saying anything, Gibbs attempted to insert his foot between the appellant and Junior as they were rolling on the ground, in an effort to break them apart. Senior approached Gibbs from behind and pulled him away, holding him in a "bear hug." Gibbs described the hug and what followed as "all encompassing, pick up, move, at which point I scurried to the back and called the police." Junior was 6 feet 2 inches tall, and 210 pounds; Gibbs was 5 feet 8 inches tall, and 155 pounds.

Gibbs did not recall Senior's saying anything as he picked him up in the bear hug. Senior released Gibbs right away and did not take any steps to prevent Gibbs from calling the police. While Gibbs was on the telephone with the police, he saw Senior "standing there." At that point, Gibbs observed Ed-

ward Timnivliouglou, the owner of the pizza shop next door, arrive and manage to break up the fight.

Timnivliouglou testified that he was in the common parking area outside the deli when he noticed the appellant standing at the deli door telling a male customer, who turned out to be Junior, to leave. The scene caught Timnivliouglou's eye because the men were exchanging words and, even though it was closing time, it was unusual for the appellant to be insisting that a customer leave. Timnivliouglou was watching when Junior punched the appellant in the face, knocking him backward into the deli. Timnivliouglou sprinted over, entered the deli, and saw the appellant on the ground with Junior on top of him, hitting and punching him. He saw Gibbs being restrained by a man who turned out to be Senior, and heard Gibbs asking to be let go. Timnivliouglou ordered Junior to stop fighting and managed to get between the appellant and Junior and break them apart.

Although on direct examination Timnivliouglou testified that he heard Senior speaking words that seemed to be encouraging his son to keep fighting, on cross-examination, after being presented with the transcript of his testimony before the Commission, Timnivliouglou acknowledged that all he could hear was "ladies screaming," and that he "really was deaf to anything else."

Finally, Belle Pollack, a medical assistant, testified that on the day in question she was inside the deli with a patient who used a wheel chair. They were eating lunch when the Ravenet party came in and ordered sandwiches. Junior seemed intoxicated and smelled of alcohol. He became upset over a mistake with his order and "carried on." When the appellant went to the door and told Junior to leave, Junior punched him in the face. The appellant fell backward and Junior got on top of him and was hitting him. Gibbs tried to break up the fight, and Senior "confined" him by holding him back, in a bear hug. When Senior restrained Gibbs he said "stay out of it," or words to that effect. He held Gibbs for "a good minute or two." Pollack did not hear Senior encourage his son to punch

the appellant, or urge him to get in a conflict. Ultimately, the fight was broken up by Timnivliouglou, who entered the deli from outside.

At the conclusion of the appellant's case, the appellees moved for judgment, and the court heard argument of counsel. It then reviewed the evidence, pointing out several inconsistencies in the testimony. For example, according to Gibbs, Senior had released him and was on the telephone with the police when Timnivliouglou entered the deli. Yet, according to Timnivliouglou, he entered the deli before Senior grabbed Gibbs and in time to witness that event. The court also expressed doubt about Timnivliouglou's and Pollack's abilities to recall the events.

After discussing the evidence, the trial court ruled that it was not persuaded by a preponderance of the evidence that Senior was aiding or abetting his son in committing a battery.

The appellant argues that the court incorrectly imposed a "specific intent" element to the tort of aiding and abetting, when there is no intent element at all. To support that argument, he relies on *Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 251 (4th Cir.1997), *cert. denied*, 523 U.S. 1074, 118 S.Ct. 1515, 140 L.Ed.2d 668 (1998) (applying Maryland law). As noted, the appellant also asserts that the court's ruling was in error because the evidence "clearly established" that Senior held Gibbs in a bear hug so as to keep him from breaking up the fight, thereby permitting the attack to continue; and that he thus aided and abetted his son in committing the battery. Neither argument has merit.

■ Maryland recognizes that one may be held civilly liable in tort as an aider and abettor to a tort committed by another. *Alleco Inc. v. Weinberg Foundation*, 340 Md. 176, 199, 665 A.2d 1038 (1995). In *Duke v. Feldman*, 245 Md. 454, 226 A.2d 345 (1967), a wife was prosecuted civilly on the theory that she had aided and abetted her husband's commission of a civil battery. The victim was a real estate broker, and was selling houses in a new development in which he lived.

The husband had paid a deposit on one of the houses, but had lost the money when the developer became insolvent.

The husband and wife and their children drove into the neighborhood to look at the house they had hoped to buy. The husband decided to talk to the victim about getting the family's money back. With his wife and children in the car, he walked into the victim's back yard, carrying a wrench, and hit him. He then returned to the car, told his wife to get behind the wheel, and got in the passenger's side of the vehicle. The wife did as she was told and they drove off.

In affirming a directed verdict entered in favor of the wife, the Court explained:

> A person may be held liable as a principal for assault and battery if he, by any means (words, signs, or motions) encouraged, incited, aided or abetted the act of the direct perpetrator of the tort. However, a person who was present when an assault or battery was committed is not liable as a participant in the absence of any action on his part amounting to an encouragement of the tortious incident. Silent approbation or pleasure in an assault and battery inflicted by another does not make a person, who has not encouraged or aided the perpetrator, liable in damages therefor.

*Id.* at 457–58, 226 A.2d 345 (citations omitted). The Court stated that the evidence taken in a light most favorable to the victim did not show that the wife "in any way encouraged, counseled, aided or abetted her husband" in perpetrating the battery. Apparently, some evidence showed that the husband had made threats against the victim in the past. The Court observed, however, that,

> [e]ven if [the wife] knew that he had made threats to [the victim . . .], there was nothing to show that she was aware of any design or intent on the part of her husband to carry out those threats when they visited [the development]. Without more evidence a jury could not be allowed to speculate that the wife's purpose in visiting [the development] was to promote and aid her husband in an assault on

[the victim]. When her husband suddenly announced that he wanted to see [the victim], he gave no indication of his purpose. [The wife] asked her husband to try to get their money back, but she did not say or intimate that he should assault [the victim] in order to do so.

*Id.* at 458, 226 A.2d 345. The Court further pointed out that there was no evidence that the wife saw her husband approach the house with a wrench in hand; and because she was caring for her children in the car, even if she had seen the attack, there was nothing she could have done about it.

In *Rice v. Paladin Enterprises, Inc., supra,* the Fourth Circuit held that a publisher of a "murder for hire" manual that was used by a "hit man" who committed a murder could be held liable in tort for aiding and abetting the murderer. In reversing a grant of summary judgment in favor of the publisher, the court stated:

The primary, and possibly only, difference between Maryland's civil and criminal laws of aiding and abetting is the intent requirement. As Judge Learned Hand explained in discussing generally the difference between civil and criminal aiding and abetting laws, the intent standard in the civil tort context requires only that the criminal conduct be the "natural consequence of [one's] original act," whereas criminal intent to aid and abet requires that the defendant have a "purposive attitude" toward the commission of the offense. *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938)[,] ... We assume that Maryland prescribes a higher intent standard for the imposition of criminal liability than it does for civil liability.

*Id.* at 251 (citations omitted).

As this paragraph makes plain, contrary to the appellant's argument, the Court in *Rice* did not hold that there is no "intent" element to the tort of aiding and abetting. It merely explained that while proof of criminal aiding and abetting requires a heightened showing that the aider and abettor had the purpose to accomplish the underlying criminal act, proof of tortious aiding and abetting requires a lesser showing that the

aider and abettor engaged in conduct knowing that the criminal (or tortious) act would be the natural consequence of his conduct. This standard is consistent with the concept articulated in the Maryland case law, discussed above, that aider and abettor tort liability is predicated upon the wrongdoer's engaging in acts of encouragement or assistance to the person actually committing the wrongful act. To be liable in tort, the aider or abettor must have engaged in assistive conduct that he would know would contribute to the happening of that act.

The circuit court did not find against the appellant on the basis of a misunderstanding of the law. It plainly applied the correct legal standard. The court found, on the facts, that the appellant did not prove by a preponderance of the evidence that Senior grabbed Gibbs and held him in a bear hug knowing that a battery by Junior would be the natural consequence of that act, and as a means of assisting Junior in his attack.

In deciding a motion for judgment at the close of the plaintiff's case in a bench trial, the court may rule on facts. Rule 2–519(b). That is what the court did here. The appellant in effect argues that the facts could not reasonably support the court's finding that Senior was not a tortious aider an abettor. Notwithstanding that a different fact-finder might have reached a different conclusion, when the facts are viewed in the light most favorable to the judgment, under the proper standard, see Rule 8–131(c), we are satisfied that the court's decision was supported by the evidence.

Gibbs testified that the primary assault by Junior on the appellant happened at the doorway, before Senior grabbed him (Gibbs) and when all Senior had done was to apologize for his son's conduct. He further testified that Senior held him only momentarily, put him right down, did not interfere with his efforts to call the police, said nothing, and did nothing other than to stand back. The court could credit that testimony and find that, given Gibbs's and Junior's relative sizes, Senior could have foreseen that as a natural consequence of that act *fewer* people would be injured—not that the appellant

would have sustained a more extensive injury than he already had. The court also could have concluded that the conduct of Senior, viewed *in toto,* was that of a non-participating bystander, not that of an assister or encourager.

The trial court's finding that Senior did not tortiously aid or abet Junior in committing a battery against the appellant was supported by the evidence. The finding resulted in a final determination that, by entering into a settlement with Junior, the appellant released from liability the only third-party tortfeasor responsible for his injuries. By releasing Junior before making a claim for workers' compensation, and without the knowledge or consent of Ohio Casualty, the appellant extinguished the subrogation right Ohio Casualty would acquire if and when compensation were awarded. His doing so was inconsistent with his later attempt to seek and obtain workers' compensation. Accordingly, in releasing Junior, the appellant elected a tort remedy, to the exclusion of workers' compensation.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**