Affirmed in part and reversed and remanded in part by published opinion. Judge MOTZ wrote the opinion, in which Judge NIEMEYER and Judge LUTTIG concurred in part and dissented in part. Judge NIEMEYER wrote an opinion concurring in Part II and dissenting from Part III and dissenting from the judgment. Judge LUTTIG wrote an opinion concurring in Part II and a portion of Part III, and dissenting from a portion of Part III and from part of the judgment.
OPINION
DIANA GRIBBON MOTZ, Circuit Judge:
Dominique Gantt informed her employer, a private security company, that she had obtained a protective order barring her former boyfriend from any contact with her. But Gantt’s supervisor, apparently believing that the estranged couple “should talk,” permitted the boyfriend access to Gantt. The boyfriend then, at gunpoint, kidnaped Gantt from her work place and held her captive for six hours, assaulting and raping her. Gantt brings this action against her employer seeking damages for her resulting severe emotional and mental distress; she asserts that her employer violated its Fifth Amendment duty to prevent sexual harassment in the workplace and intentionally inflicted emotional distress upon her. Because no Fifth Amendment claim lies against a private entity, we affirm the district court’s dismissal of this claim. However, the district court erred in its analysis of Gantt’s emotional distress claim; accordingly, we must reverse part of its grant of summary judgment to the employer on this ground, and remand for further proceedings.
I.
On November 6, 1996, upon finding that Gary R. Sheppard had caused Gantt serious bodily harm by “repeated acts of violence,” a Maryland court granted Gantt a protective order. The protective order barred Sheppard from abusing, threatening, or contacting Gantt anywhere — including her home or “place of employment”— and by any means — in person, on the telephone, or in writing.
The next day, Gantt notified her employer, Security, USA, Inc., of the protective order and even brought a copy of the order to officials at Security USA for their examination. Security USA Project Manager Earl Wood then notified all Security USA supervisors that Gantt should only be assigned to secured inside posts so that Sheppard could not gain access to her at work.
Sheppard, who worked as a security officer at another private security company, Wackenhut Services, was “weapon qualified”; that is, he was trained and qualified to use a gun. At Wackenhut, Sheppard worked during the week with Sgt. Angela Claggett, who supervised Gantt at Security USA on weekends. Sgt. Claggett acknowledged that she had a “friendly relationship” with Sheppard.
Sgt. Claggett testified that Security USA Manager Wood told her when Gantt obtained a protective order against Sheppard, and that Sgt. Claggett had been *550 directed to move Gantt to an “inside location at the loading dock.” Gantt, herself, also talked with her supervisor, Sgt. Clag-gett, about the protective order. Sgt. Claggett reported that Gantt told her that Sheppard “hit her [Gantt] and that this hadn’t been the first time and she was tired of it and didn’t want to go through it anymore.” In addition, Sgt. Claggett acknowledged that she knew Sheppard had attempted to break into Gantt’s mother’s house while Gantt was there. Gantt testified that she told Sgt. Claggett that Sheppard threatened to kill her if she did not “drop the charges ... from the previous incident at my mother’s house.”
Other sources confirmed what Gantt had told Sgt. Claggett. Sheppard himself talked with Sgt. Claggett about the protective order and his conduct. He acknowledged that he had “put [his] hands” on Gantt but claimed that he “loved her.” According to Sgt. Claggett, she told Sheppard that he “shouldn’t have done that” but that “it’s understandable” and “you all need to talk.” Sgt. Claggett also testified that she had heard that Sheppard threatened to “kill himself, his children, his wife and Ms. Gantt.”
Despite Sgt. Claggett’s admitted knowledge of Sheppard’s abuse of Gantt and threats to kill her, in November (after issuance of the protective order) when Sheppard telephoned Gantt at work, Sgt. Claggett took the call and urged Gantt to talk to Sheppard. Gantt refused, saying “[h]e’s not supposed to be calling me at my job.” Sgt. Claggett responded, “just talk to him” and transferred the call immediately to Gantt. After telling Sheppard “[pjlease don’t call again ... I’ll notify the court” and hanging up on him, a distressed Gantt reported Sgt. Claggett’s conduct to Project Manager Wood. Nonetheless, Sgt. Claggett later in November transferred still another call from Sheppard to Gantt, saying “all he wants to do is talk to you.”
On the first Saturday of the next month, December 7, 1996, at 6:00 A.M., Gantt reported to work for Security USA at the Internal Revenue Service building in Lan-ham, Maryland. Sgt. Claggett was the “senior person in charge”; no one else at the site was “above Ms. Claggett.” Sgt. Willie Jones, concluding his shift and being replaced as the supervisor by Sgt. Clag-gett, reminded Claggett that “we got to leave Dominique [Gantt] inside.” Yet after Sgt. Jones left, Sgt. Claggett ordered Gantt to assume unsecured Post # 9 outside the building. Gantt tried to refuse, reminding Sgt. Claggett “you know this stuff is still going on and ... I am supposed to be inside.” Sgt. Claggett ordered Gantt “to go right to” Post # 9 and “just got louder and louder” as she did so. Finally, Gantt obeyed Claggett and went outside to unsecured Post # 9.
Within fifteen minutes of Gantt assuming her assignment at Post # 9, Sheppard telephoned her at her work station. Gantt testified that the phone’s display indicated that Sheppard’s call was transferred to her from Sgt. Claggett’s inside extension. During the brief telephone call, Sheppard was “really mean” to Gantt and she hung up on him. Distraught, Gantt then telephoned Sgt. Claggett, told her Sheppard had “just called” and that Gantt “wanted to be moved to an inside post.” Sgt. Clag-gett refused to permit Gantt to move inside to safety.
At approximately 7:00 A.M., Sheppard arrived at the IRS building and proceeded to Gantt at Post # 9. Gantt ran from Post # 9 toward an entrance to the IRS building in search of safety. Sheppard pulled a shotgun from his trench coat and with the gun drawn and aimed at Gantt, chased her through the area surrounding Post # 9, shouting “Run! Run!” Sheppard chased *551 Gantt until he caught her, then grabbed her by her arm, and pressing the shotgun against her chin, placed her in a choke hold. Sheppard dragged Gantt along an outside area of the IRS building, off the premises, and into his van.
Two security guards at the IRS building witnessed Sheppard kidnap Gantt. One of these guards, in the presence of Officer Darren Harvey, reported Gantt’s abduction at gunpoint to Sgt. Claggett. When it was suggested that the police be called, Harvey testified that Sgt. Claggett said “no, we don’t need to call the police because he doesn’t want to hurt her, he just wants to talk to her.” Someone eventually did call the police. At her deposition, Sgt. Claggett testified that she did so, but acknowledged that she did not call until “five to ten minutes” after the abduction, even though she conceded that she knew that five or ten minutes can mean the difference between life and death when someone is held at gunpoint.
Sheppard held Gantt captive for six hours, driving through Maryland, Delaware, and the District of Columbia to evade police. He raped and physically and verbally terrorized Gantt, threatening to kill her with his shotgun. Gantt repeatedly begged for her life and eventually convinced Sheppard that she would reconcile with him and tell the police she went with him willingly. Sheppard then hid his shotgun and surrendered to the police.
Sheppard was convicted in state court of kidnaping, first degree rape, and violation of the restraining order. The court sentenced him to twenty years imprisonment.
When Gantt returned to work at Security USA, she told Project Manager Wood and Internal IRS investigative officers she believed that Sgt. Claggett bore responsibility for Sheppard’s assault of her. Wood never responded to or acted on this complaint. Instead, Security USA permitted Claggett to maintain her supervisory duties and rank as sergeant and, when on Sgt. Claggett’s shift, Gantt had to report to her.
On December 2, 1999, Gantt filed suit in state court against Security USA; the company removed the case to federal court. Gantt alleges that as a result of the events of December 7, 1996, she has suffered physical injury, severe emotional distress, “recurring nightmares and other mental health issues, which have dramatically reduced her quality of life.” She contends that she has undergone “medical evaluation and treatment,” incurred medical expenses, and lost wages. Although Gantt alleged a number of theories of recovery in her complaint, she only appeals the district court’s rejection of her sexual harassment and intentional infliction of emotional distress claims. We consider each in turn.
II.
Gantt contends that the district court erred in dismissing her sexual harassment claim. Specifically, she maintains that Security USA “fail[ed] to take reasonable steps to end, and indeed facilitated, the sexual harassment by Sheppard, creating a hostile work environment.” Brief of Appellant at 14.
In her complaint, Gantt alleged that in so failing, Security USA violated the Fifth Amendment of the United States Constitution, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (2000), and Article 49B of the Maryland Annotated Code, Md. Code Ann., § 49B (1998). The district court dismissed her statutory claims, reasoning that Gantt failed to exhaust her administrative remedies, a prerequisite for a Title VII claim, and that Article 49B does not create a private cause of action of sexual harassment. Gantt does not appeal *552 those dismissals. Thus, as Gantt recognizes, the only possible basis for her sexual harassment claim is the Constitution. As she also recognizes, in order to state a constitutional claim, she must allege facts, which, if proved, would establish Security USA is a governmental actor.
Gantt has attempted to satisfy this requirement by alleging that Security USA “acted as an agent or instrumentality of the United States government to protect persons and property on the premises of the IRS building” and so had a Fifth Amendment duty to protect her from workplace sexual harassment.[1] In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court did recognize an implied private action for damages against agents of th333333333e United States alleged to have violated a citizen’s constitutional rights. However, the Court has specifically declined to “extend this limited holding to confer a right of action for damages against private entities acting under color of federal law.” Correctional Services Corp. v. Malesko, 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (refusing to allow a Bivens claim against a halfway house operated by private entity under contract with the Bureau of Prisons) (emphasis added). Indisputably, Security USA is a private entity; therefore no Bivens claim lies against the company. For this reason, the district court properly dismissed Gantt’s constitutional sexual harassment claim against Security USA.
III.
Gantt’s intentional infliction of emotional distress claim presents a more complicated question. Although the district court denied Security USA’s motion to dismiss this claim, the court ultimately granted the company summary judgment on the claim. We believe the court erred in doing so.
A.
The district court correctly recognized, that in Maryland (as in many other jurisdictions) a claim of intentional infliction of emotional distress has four elements:
(1) The conduct must be intentional or reckless; (2)[t]he conduct must be extreme and outrageous; (3)[t]here must be a causal connection between the wrongful conduct and the emotional distress; (4)[t]he emotional distress must be severe.
Manikhi v. Mass Transit Admin., 360 Md. 333, 758 A.2d 95, 113 (2000) (internal quotation marks and citations omitted).
In its seminal case recognizing intentional infliction of emotional distress as a valid tort in Maryland, the state’s highest court relied on Restatement (Second) of Torts § 46, comment i (1965) to explain the first element:
the defendant’s conduct is intentional or reckless where he desires to inflict severe emotional distress, and also where he knows that such distress is certain, or *553 substantially certain, to result from his conduct; or where the defendant acts recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow.
Harris v. Jones, 281 Md. 560, 380 A.2d 611, 614 (1977); accord, B.N. v. K.K., 312 Md. 135, 538 A.2d 1175, 1180 (1988); see also, Kentucky Fried Chicken Nat’l Mgmt. Co. v. Weathersby, 326 Md. 663, 607 A.2d 8, 17 (1992) (“We apply the law of intentional infliction of emotional distress as we adopted it nearly 15 years ago in Harris v. Jones.”), Foor v. Juvenile Services Admin., 78 Md.App. 151, 552 A.2d 947, 959 (1989) (explaining that to meet the first element a pla3intiff must offer evidence that “the defendant either desired to inflict severe emotional distress, knew that such distress was certain or substantially certain to result from his conduct, or acted recklessly in deliberate disregard of a high degree of probability that the emotional distress will follow.” (emphasis in original)).
The district court properly stated and applied this standard in concluding that Gantt had satisfied the first element of the tort with respect to one portion of her intentional infliction of emotional distress claim. The court reasoned that Gantt:
has forecasted evidence that Claggett’s assignment of Plaintiff [i.e. Gantt] to Post 9 was an intentional act given that Claggett was aware that Sheppard has talked about killing Plaintiff, that Plaintiff was afraid of Sheppard, and that she had obtained a restraining order against him. Looking at the evidence in the light most favorable to the Plaintiff, one could conclude that Claggett intentionally assigned Plaintiff to a post where she knew Plaintiff would be in fear and then refused Plaintiffs requests to leave the post after Sheppard called her there.
This conclusion seems unassailable. However, turning to the third and fourth elements, the court rejected Gantt’s intentional infliction of emotional distress claim, concluding that the emotional distress actually caused by Claggett’s intentional conduct — which the court determined to be “the fear she suffered while waiting at the post ” — did not meet “the high burden imposed by the requirement that a plaintiff’s emotional distress be severe.” (emphasis in original and internal quotation marks and citation omitted). This was error.
The court artificially restricted the emotional distress caused by Claggett’s intentional conduct to the fear Gantt experienced while waiting at the post, ignoring the fact that Gantt has testified that the hour she spent waiting in fear of Sheppard’s arrival had a longer-term emotional impact. Gantt has alleged not just that her abduction and rape caused severe emotional distress, but generally that “[a]s a result of the injuries sustained on December 7, 1996,” she has been caused “recurring nightmares and other mental health issues which have dramatically reduced her quality of life.” Gantt has testified that she has been forced by the events of December 7 (not just the abduction and rape) to seek psychiatric or psychological counseling for anxiety attacks, when she never before had suffered such attacks or sought such counseling. Gantt also testified that she “still” cannot “go too many places by myself’ and she “keeps having anxiety attacks,” which occur “three, four and five times a week” and frequent nightmares.
Security USA has failed to offer convincing evidence indicating that Claggett’s assignment of Gantt to unsecured Post # 9 and Claggett’s obdurate refusal to remove Gantt even after Sheppard telephoned her there could not have caused a significant portion of the severe emotional distress *554 that Gantt testified she continued to suffer after December 7. Given this record, we cannot hold that the district court properly granted summary judgment on this basis. We note that Maryland’s highest court has held that an employee’s far less egregious conduct toward another employee caused emotional distress sufficient to preclude summary judgment for the employer. See Federated Dep’t Stores, Inc. v. Le, 324 Md. 71, 595 A.2d 1067 (1991) (holding trial court should not have granted summary judgment to employer when employee offered evidence a company security officer falsely accused him of stealing a calculator and coerced him into signing a confession, resulting in his loss of his job (not fear for his life like Gantt) and loss of sleep “for weeks” (not still reoccurring nightmares like Gantt)).
With respect to the second portion of Gantt’s emotional distress claim — that growing out of the abduction and rape— the district court did correctly acknowledge what we believe is undeniable: the distress suffered as a result of these acts “would likely meet the high burden of ‘severe emotional distress.’ ” The court held, nevertheless, that the acts did not provide the basis of an intentional infliction of emotional distress claim because they were “caused by Sheppard, not by Clag-gett ” and no evidence suggested that Claggett “intended for Plaintiff to suffer, or even recklessly disregarded the possibility of, the severe emotional trauma of being abducted, threatened and raped.” (emphasis in original). The court concluded that “[ojnce again, therefore, the causal link between wrongful intentional conduct and severe emotional distress required by the third prong is absent.”
There are several problems with this analysis. First, the district court seems to have concluded that the presence of an intervening actor, Sheppard, necessarily severs any causal connection between Claggett’s intentional conduct and the severe emotional distress suffered by Gantt during the abduction. Second, given Clag-gett’s knowledge about Sheppard’s past behavior and threats of violence, the court too easily dismissed the argument that Claggett recklessly disregarded a high degree of probability that assigning Gantt to Post # 9 would result in her suffering violence at the hands of Sheppard. Finally, the court completely ignored Gantt’s evidence that Claggett aided and abetted Sheppard, a tort that would require Clag-gett to only “have engaged in assistive conduct that [s]he would know would contribute to the happening of that act.” Saadeh v. Saadeh, Inc., 150 Md.App. 305, 819 A.2d 1158, 1171 (Md.Ct. Spec.App.2003). Thus Gantt appears to have forecast evidence that Claggett engaged in conduct that knowingly assisted or recklessly disregarded a high probability that Gantt would be subjected to severe emotional distress in connection with the second portion of her emotional distress claim.
This, however, does not end the inquiry.
B.
Because, as Gantt concedes, her emotional distress arose out of, and in the course of, her employment with Security USA, regardless of whether she forecast evidence sufficient to prove an intentional infliction of emotional distress claim, she must also offer evidence that her employer deliberately intended to injure her. This is so because the Maryland Workers’ Compensation Act, Md.Code Ann., Lab. & Empl. § 9-509(a)-(b)(1999)(the Act), provides Gantt’s exclusive remedy unless she can prove she was injured “as the result of the deliberate intent of [her] employer to injure” her. Id. § 9-509(d) (emphasis added). Maryland’s high court has unequivo *555 cally held that this intentional tort exception to the Act’s normal exclusivity rule requires proof of the employer’s “actual, specific and deliberate intent to injure the employee.” Johnson v. Mountaire, Farms of Delmarva, 305 Md. 246, 503 A.2d 708, 712 (1986). Proof of an employer’s “-willful, wanton, or reckless conduct” even when that conduct is “undertaken with a knowledge and appreciation of a high risk to another” does not suffice. Id. An employee cannot bring a tort action based on such evidence; rather, in those circumstances, the Act provides an employee’s exclusive remedy. Id.
In ruling on Security USA’s motion to dismiss all of Gantt’s tort claims on the ground that the Maryland Workers’ Compensation Act provides her exclusive remedy for those claims, the district court clearly understood the proper relationship between the Act and common law torts.[2] The court dismissed Gantt’s negligence, gross negligence, and negligent hiring claims because it found the Act barred Gantt from recovering from her employer in a tort action on these bases. But the court specifically refused to dismiss the intentional infliction of emotional distress claim, finding that the intent to injure exception of the Workers’ Compensation exclusivity rule applied to it.
When considering Security USA’s motion to dismiss Gantt’s emotional distress claim, the district court carefully recounted Gantt’s allegations as to Security USA’s intent and found that, under Maryland law, Gantt had alleged facts sufficient to come within the intent to injure exception. In so concluding, the court relied on the most analogous Maryland case, Le, 324 Md. 71, 595 A.2d 1067. There, an employee sued his employer for intentional infliction of emotional distress after a company security guard coerced him into signing an allegedly untrue confession to theft, an act which assertedly caused the employee to cry, lose his job, and be unable to trust people or “sleep for weeks after his discharge.” Id. at 1067. On these facts, the trial court in Le granted the employer summary judgment, finding the Workers’ Compensation Act provided the employee’s exclusive remedy. Id. at 1070. Maryland’s highest court reversed, holding that the “deliberate intent to injure” exception to the Workers’ Compensation exclusivity rule applied, and so the “employer [could] be held liable” to his employee in tort for intentional infliction of emotional distress. Id. at 1074, 1075.
On appeal, Security USA does not contend that the district court erred in refusing to dismiss Gantt’s emotional distress claim on grounds of Workers’ Compensation exclusivity. Indeed, at oral argument Security USA acknowledged that this ruling was correct, given Gantt’s “allegations.” Security USA maintains, however, that on summary judgment the district *556 court should have concluded that the “intent to injure” exception to Workers’ Compensation exclusivity did not apply to Gantt’s intentional infliction of emotional distress claim.
We cannot agree with this argument with respect to the first portion of Gantt’s emotional distress claim — that growing out of Claggett’s intentionally assigning Gantt to unsecured Post # 9. Certainly in connection with that portion of her claim, Gantt has offered as much evidence of “deliberate intent to injure” as the plaintiff-employee in Le.[3] A jury could infer from the evidence proffered by Gantt that Security USA’s supervisor, Claggett, despite awareness of Sheppard’s abuse of Gantt and Gantt’s well-founded fear of Sheppard, believed it all-important that Gantt and Sheppard “talk,” and so deliberately determined to inflict on Gantt any emotional distress she might suffer from talking to Sheppard, even talking to him face to face, at Post # 9 on December 7, 1996. Thus Gantt has offered evidence from which a jury could conclude, as she asserted in opposing Security USA’s motion to dismiss, that “Claggett intentionally inflicted emotional distress upon Dominique Gantt when she ordered her to assume Post 9, while fearing for her life.”
With respect to the second portion of Gantt’s emotional distress claim — that growing out of the abduction and rape— however, we agree that Gantt has failed to offer evidence at the summary judgment stage sufficient to support her assertion at the motion to dismiss stage that Claggett “intentionally assigned Dominique Gantt to Post 9, with the intention and for the purpose of giving Gary Sheppard access to her so that he could assault her, batter her, [and] kidnap her.” Gantt simply did not present evidence from which a reasonable jury could find that Claggett acted with an “actual, specific and deliberate intent” to cause, and with a “desire to bring about” the assault, battery, rape, and emotional distress resulting from them. See Johnson, 503 A.2d at 712. Just as in Johnson, Maryland’s highest court affirmed the dismissal of Rodney Johnson’s claim because he failed to allege facts “to show that [his] employer had a ‘desire’ to bring about the consequences of the acts or that the acts were premeditated with the specific intent to injure Rodney,” so we must affirm the grant of summary judgment on this portion of Gantt’s emotional distress claim because she has failed to offer evidence demonstrating that her employer “had a ‘desire’ to bring about” her *557 abduction, rape, and resulting emotional distress, or that its “acts were premeditated with the specific intent” to impose this injury on her. Id.
IV.
In summary, we affirm the district court’s order dismissing Gantt’s sexual harassment claim and that portion of its order granting summary judgment on the emotional distress claim growing out of her abduction and rape. We reverse that portion of the order granting summary judgment on the emotional distress claim growing out of Claggett’s intentional assignment of Gantt to unsecured Post # 9.

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART

. On appeal, Gantt seeks to widen the legal basis of her constitutional claim, contending that she has alleged a “violation of the Fifth and Fourteenth Amendments of the Constitution, guaranteeing equal protection under the law pursuant to 42 U.S.C. § 1983.” Brief of Appellant at 14 (emphasis added). We must reject this contention. Not only has Gantt failed to invoke the Fourteenth Amendment or § 1983 in her complaint, but she has also failed to assert any facts in the complaint giving rise to Security USA’s liability as a state actor. Rather, Gantt's case for governmental action hinges on her allegations that Security USA acted under color of federal law. Moreover, the arguments Gantt asserts in her appellate briefs would not establish state action, even if she had alleged the necessary underlying facts in her complaint.

. Security USA does not. Although the company recognizes that when, as here, an intentional tort causes the claimed injury, § 9-509(d) provides an exception to the normal Workers’ Compensation Act exclusivity rule, it argues that this intentional tort exception somehow requires Gantt to prove as the "first prong” of her intentional infliction of emotional distress claim "a deliberate intent to injure.” Brief of Appellee at 23. In fact, all “prongs” of an emotional distress claim— including the first — remain the same no matter who the plaintiff and defendant are. What the Workers' Compensation Act does do is preclude a covered employee from recovering from her employer in tort unless the employee was injured "as the result of the deliberate intent of the employer to injure.” § 9-509(d). Thus the Act may preempt Gantt’s ability to recover in a tort action for intentional infliction of emotional distress against Security USA, but, contrary to Security USA’s suggestion, the Act does not change the quantum of proof necessary to establish the "first prong” of the tort.

. Judge Niemeyer contends that because Claggett was the lowest level supervisor, post at 559-60 (albeit the only supervisor at the time of the December 7 incident), her conduct should not be imputed to Security for purposes of the Workers' Compensation "intent to injure” exception. But Security, like any corporation, can act only through its agents, and Gantt has specifically alleged that Security acted through its agents, "particularly Sgt. Claggett,” in its treatment of her. Neither in moving for summary judgment nor on appeal has Security attempted to disavow any of Sgt. Claggett's conduct or argue that it should not be imputed to the company for purposes of the "intent to injure” exception. The company’s reluctance to disavow Sgt. Claggett’s conduct may well rest on its reading of the directive of the Le court that "for an employer to be held liable for the intentional torts of an employee committed within the scope of employment, the employee need not be the alter ego of the employer” and the "employee's acts need not be expressly authorized” by the employer. Le, 595 A.2d at 1074 (internal quotation marks and citations omitted). Although Le did not delineate the precise boundaries of the employer's vicarious liability in the context of the "intent to injure” exception, certainly its holding and Security's failure to argue that Sgt. Claggett's conduct could not be imputed to the company counsel against upholding the district court's grant of summary judgment on this alternative ground.