854 A.2d 233

## CHANEY ENTERPRISES LIMITED PARTNERSHIP

v.

### Bernard R. WINDSOR, Jr., et al.

### No. 00715, Sept. Term, 2003.

Court of Special Appeals of Maryland.

July 16, 2004.

Steven T. Cain (Cain & Wyrough, PC, on the brief), Marlboro, for Appellant.

David E. Grover, Rockville, and Thomas F. McDonough (Royston, Mueller, McLean & Reid, LLP, on the brief), Towson, for Appellee.

Panel: DAVIS, HOLLANDER, and JAMES R. EYLER, JJ.

**4**

HOLLANDER, Judge.

In this worker's compensation case, we must determine whether the Workers' Compensation Commission (the "WCC" or the "Commission") erred in finding that Chaney Enterprises Limited Partnership ("Chaney"), appellant, was the employer of appellee Bernard Windsor, Jr. in May 1995, when Windsor was severely injured while on "loan" to Genstar Stone Products Company, now known as Redland Genstar, Inc. ("Genstar"), appellee. Chaney and its insurer never contested Windsor's workers' compensation claim. Nevertheless, in late 2000, Chaney filed a civil suit against Genstar, contending that Genstar was Windsor's special employer when the accident occurred, and therefore Chaney was entitled to indemnification for the workers' compensation benefits it had paid. The Circuit Court for Prince George's County stayed the suit, so that Chaney could present the issue to the WCC.

Accordingly, Chaney filed "issues" with the Commission, asking it to determine whether, at the time of the accident, Genstar was Windsor's "special employer" or, alternatively, his "joint employer." The WCC determined that, based on "estoppel," Chaney was the correct employer. Thereafter, Chaney sought judicial review in the circuit court, which affirmed. This appeal followed, in which Chaney poses the following two questions:

I.    Did the circuit court err in not sending the case back to the Workers' Compensation Commission for proper factual findings?

II.   Did the circuit court err in affirming the decision of the Workers' Compensation Commission finding estoppel and/or waiver without any necessary factual support?

For the reasons that follow, we shall affirm.

## FACTUAL AND PROCEDURAL SUMMARY

The WCC held an evidentiary hearing on December 3, 2001. Among other things, the parties submitted numerous exhibits, including the deposition testimony of Windsor; Rick Sheetz, a Genstar supervisor; Jim Talbott, a Chaney supervisor; Ken-

neth Gerrity, a former risk manager for Genstar; and Mary Ann Craze Reuschling, Chaney's Safety Director.

For approximately twenty-four years, Windsor worked for Chaney as a heavy equipment operator. At the time, Windsor earned an hourly wage of $12.65. Liberty Mutual Insurance Company ("Liberty Mutual" or the "Insurer") provided worker's compensation insurance coverage to Chaney, but is not a party to this appeal.

Genstar was located adjacent to Chaney's premises. On May 22, 1995, Rick Sheetz, a Genstar supervisor, asked Jim Talbott, a Chaney supervisor, whether Chaney would make a heavy equipment operator available to Genstar "for a few days." Chaney verbally agreed to make Windsor available to Genstar. In return, Genstar agreed to pay Chaney $25 per hour. As it turned out, Genstar never made any payments to Chaney.

For three days in May 1995, Windsor punched in at Chaney's facility, then reported to work at Genstar, and later punched out at Chaney. During that period, Windsor informed Talbott that the conditions at Genstar were not safe, because the dry screen machinery with which he was working lacked certain safety equipment and was in disrepair. Sam Chase, the Genstar plant manager, was Windsor's direct supervisor with regard to the operation of the dry screen machine.[1]

Windsor's fourth day of work at Genstar was an unfortunate one. On that day, May 25, 1995, a root or stick became stuck in the conveyor belt of the dry screen equipment. As Windsor climbed down from the operator's perch to clear the belt, he was "dragged" into the machine, and suffered very serious injuries. The injuries included a broken bone above the left wrist and elbow, burns on his left side, a bruised chest, and a head laceration that required 40 stitches. After a number of surgeries, Windsor was determined to have a 70% loss of function to his left arm.

---

1. Chase has since died.

On or about May 26, 1995, Chaney submitted to the Commission a WCC form reporting Windsor's injury. The form was signed by Mary Ann Craze (now Reuschling), Chaney's Safety Director. Among other things, in the spaces provided for the name of the employer, appellant wrote "Chaney Enterprises, L.P." The form also asked if the injury occurred "on [the] employer's premises?" Chaney responded by placing an "X" next to the pre-printed word, "No". Immediately next to that response, in the same box, Chaney typed the following word: *"SUBROGATION."* In response to a question about where the accident occurred, Chaney wrote "GENSTAR STONE PRODUCTS," along with Genstar's address. In answer to a question about the equipment that the employee was using when the injury occurred, Chaney typed: "POWER SCREEN AT GENSTAR'S PLANT—TAIL PULLEY WAS NOT GUARDED." In answer to a question about the sequence of events, Chaney typed: "EMPLOYEE WAS WORKING AROUND TAIL PULLY OF POWER SCREEN, GOT ARM CAUGHT IN BELT CAUSING MULTIPLE INJURIES TO HEAD, CHEST, & L. ARM." Chaney also identified two witnesses, both of whom were noted as employees of Genstar.

Through Liberty Mutual, Chaney promptly began making worker's compensation payments to and on behalf of Windsor. Payments from Chaney or its Insurer continued for five years, without objection from Chaney or the Insurer.

On or about June 12, 1995, Windsor submitted an "Employee's Claim" with the Commission, in which he identified "Chaney Enterprises, Inc." as his employer. The form contains the following pre-printed text in a box at the bottom of the page:

**ATTENTION: FOR EMPLOYER AND
INSURER INFORMATION ONLY**

Consideration Date: Unless the compensability of this claim is contested by the filing of issues with the Commission on

or before an appropriate award will be passed.[2]

Between the period June 13, 1995, and July 17, 1995, Chaney did not file any issues with the Commission, nor did it contest the compensability of Windsor's claim. Moreover, Chaney never requested a hearing regarding Windsor's claim, and no hearing was held.

On July 18, 1995, the Commission issued an Award of Compensation, ordering Chaney and the Insurer to pay temporary total disability benefits to Windsor of $525 per week, as of May 29, 1995. Neither Chaney nor Liberty Mutual appealed from that order.

Almost three years after the accident, on May 8, 1998, Bernard and Ruth Windsor, together with Liberty Mutual, filed a tort suit against Genstar.[3] Alleging that Genstar was negligent in regard to the condition of its equipment, the Windsors sought more than $3,000,000 in damages, while Liberty Mutual sought to recover $300,000 in compensation benefits paid to Windsor or on his behalf. The Insurer's claim was based on Maryland Code, § 9–902 of the Labor and Employment Article.

Notably, the Insurer and the Windsors averred that Windsor was "employed by Chaney Enterprises at the time of the accident as a heavy equipment operator ....", but was working at Genstar's premises when the accident occurred. In addition, the Insurer asserted that it held a statutory lien for workers' compensation benefits paid to and for the benefit of

---

**2.** We did not find in the record the original form containing the consideration date. However, at the WCC hearing, Windsor's attorney stated that the consideration date was July 4, 1995.

**3.** In a legal memorandum submitted by Chaney to the WCC, Chaney alleged that Windsor filed the suit "without consulting Liberty [Mutual], presumably because Liberty had notified Windsor's counsel of an assertion of a lien on any third party recovery...." We are unaware of such a contention by Liberty Mutual. And, in Genstar's brief to this Court, it asserted that Liberty Mutual sued Genstar as a third party tortfeasor, and pointed out that "the same [law] firm that represented Liberty Mutual in the third-party tortfeasor suit also represented Chaney in the indemnification suit."

**8**

Windsor, and claimed it was "entitled to recover those benefits against the negligent party, Genstar," pursuant to § 9–102 of the Labor and Employment Article.

In its Answer, Genstar did not deny liability in tort on the ground that it was Windsor's employer at the time of the accident.[4] Rather, Genstar asserted that it was not negligent and that, in any event, Windsor was contributorily negligent.

Approximately five and a half years after Windsor's accident, on November 15, 2000, Chaney filed a two-count suit against Genstar, alleging, *inter alia*, that the parties had entered into an oral agreement in which Chaney assented "to lend" Windsor to Genstar and, at the time of the accident, Genstar was Windsor's "special employer," with "exclusive control" over Windsor.[5] Further, Chaney alleged that Genstar breached its duty to Windsor "to provide a safe work environment." Count I was titled "Indemnity." Chaney claimed that Genstar was liable to Chaney "for indemnification for any and all worker's compensation claims paid for by [Chaney] to Bernard Windsor." In Count II, titled "Breach of Contract," Chaney alleged that, "under the implied terms" of the parties' oral agreement, Genstar was obligated to provide workers' compensation benefits. In its suit, Chaney did not cite § 9–902 of the Labor and Employment Article.

Genstar moved for summary judgment in Chaney's civil suit. Relying on *Temporary Staffing, Inc. v. J.J. Haines & Co., Inc.*, 362 Md. 388, 765 A.2d 602 (2001), Genstar argued that the WCC was the appropriate forum to determine wheth-

---

4. As we discuss, *infra*, if Genstar had been Windsor's employer at the time of the accident, Windsor would not have been entitled to pursue a third party tort claim against Genstar. *See* Maryland Code, Labor and Employment Article § 9–509 (stating that "the liability of an employer under this title is exclusive").

5. Chaney's civil suit against Genstar is not directly before us. We note, however, that, in the proceedings before the Commission, Chaney alleged that Genstar was Windsor's "special employer" or, in the alternative, that Genstar was "a joint employer." In contrast, in the civil suit Chaney alleged only that Genstar was a special employer, not a dual employer.

er Genstar was Windsor's employer. Agreeing with Genstar, the circuit court stayed Chaney's case to permit Chaney to pursue the matter with the Commission. In addition, the court stayed the suit filed by Liberty Mutual and the Windsors against Genstar.

Accordingly, on May 24, 2001, a full six years after Windsor's injury, Chaney submitted WCC Form H24R, titled "Issues," in which it asked: "Is Redland Genstar, Inc., the Special Employer of Claimant and primarily responsible for payments on this claim, Chaney being the General Employer?" Chaney also filed WCC Form H25R with the Commission, entitled "Request For Action on Filed Issues," in which it sought to implead Genstar as a party.

On December 3, 2001, the Commission held a hearing, at which Chaney's counsel admitted that Chaney was Windsor's general employer. But, it claimed that Genstar was the special or dual employer. The following exchange is pertinent:

[COMMISSION]: You're raising statute of limitations?
[WINDSOR'S ATTORNEY]: That's correct.
[COMMISSION]: Or estoppel at least; right?
[WINDSOR'S ATTORNEY]: Yes.

\* \* \*

[COMMISSION]: I don't think it's a limitations argument, I think it's an estoppel argument. . . .

\* \* \*

[CHANEY'S ATTORNEY]: . . . Chaney's claim against Redland Genstar is based on a right of indemnity. And a right of indemnity does not accrue until such time as there has been payment made or until the obligation has been paid in full. Mr. Windsor's case is still open. Chaney hasn't finished paying by any stretch of the imagination, at least if [Windsor's attorney] continues to have his way. So arguably at worst, Chaney is faced with a situation where you go back three years and anything that's been paid for

the past three years they've got a right of indemnity back over against Redland Genstar. But it would be our position under the statute of limitations cases that we're entitled to go all the way back until such time as the obligation to Mr. Windsor is terminated.

[GENSTAR'S ATTORNEY]: ... I do have [*Temporary Staffing v. J.J. Haines.*] And I believe that, as a matter of law, dictates that Chaney has sat on its rights too long.

At the end of the hearing, the Commission said:

It sounds to me like there's no real disagreement as to the facts in this case, at least on the issues that we need to be concerned about, that is the time that [Genstar]'s being brought into the case, the posture of Mr. Windsor and what he was doing at that particular time. There seems to be the one fact in contention is the right of control, and the allegation is that he can be taken off the job at any time.

The Commission then asked the attorneys to submit additional materials, stating:

[W]e'll frame the issues as correct employer, dual employment, statute of limitations in terms of bringing in an additional party, estoppel in terms of bringing in the additional party at this juncture, and indemnification.

In its legal memorandum, submitted on January 3, 2001, Chaney argued, *inter alia*, that, "should the Commission feel that Genstar was not Windsor's employer, Genstar is at least culpable as a dual employer." Moreover, Chaney maintained that its claim against Genstar for indemnification was not barred by the statute of limitations, because the payments are ongoing, and the claim "accrues at the time of payment and not before."

On January 9, 2002, the Commission ruled that "the employer Chaney Enterprises is estopped from impleading Redland Genstar after six years; and ... that Chaney Enterprises is the correct employer; based on the doctrine of estoppel." Further, the Commission issued an Order on March 18, 2002, stating:

ORDERED that the Employer Chaney Enterprises is estopped from impleading Redland Genstar after six years; and

ORDERED that Chaney Enterprises is the correct employer; based on the doctrine of estoppel; and

ORDERED that the claim for indemnification is NOT bared [sic] by the statute of limitations; and

ORDERED NO on the issue of indemnification; and further ORDERED that the issue of dual employment is hereby moot.

Chaney sought judicial review of the Commission's Order in the circuit court. Following a hearing on March 20, 2003, the court issued an oral ruling on May 2, 2003, in which it affirmed.

The court noted that, by consent of the parties, it had "the same record that was presented to the Commission for consideration." After considering various exhibits, such as Chaney's First Report of Injury, the WCC's Award, and Windsor's Answers to Interrogatories, as well as the depositions submitted by the parties, the court found:

One, that Mr. Windsor was an employee of Chaney in May of 1995.

Two, that he agreed to do some work for Genstar at the request of the supervisor for several days in May of 1995.

Three, he began doing work for Genstar on May 22, 1995.

Four, that he checked in each morning at Chaney before going across the yard to work for Genstar.

Five, his immediate contact person at Genstar was Mr. Sam Chase, who is now deceased.

Six, on May 25th Mr. Windsor was seriously injured while operating equipment on the job for Genstar.

Seven, that the equipment he was operating belonged to Genstar.

Eight, a Workers' Compensation case was filed timely by Mr. Windsor. Chaney is identified as the employer and Liberty as the insurance company. *Neither [Chaney nor*

*Liberty Mutual] ever contested the issue that they were not the correct employer or insurer, or that another employer should also be held responsible.*

Nine, that on July 18, 1995, the Workers' Compensation Commission ordered that the employer Chaney and its insurance company to pay compensation to Mr. Windsor and to provide him with medical treatment.

Ten, that on May 24, 2001 Chaney filed contesting issues impleading Genstar. This was filed five years and 364 days after the event.

Eleven, the Commission ruled on March 18, 2002 that Chaney is estopped from impleading Redland Genstar after six years; that Chaney is the correct employer, based on the doctrine of estoppel; that the claim for indemnification is not barred by the Statute of Limitations; no on the issue of indemnification. Lastly, that the issue of dual employment is moot.

Twelve, that the six years since the accident Genstar has been bought by another company. Two, that Mr. Chase, Mr. Windsor's contact at Genstar has died.

(Emphasis added). The Court concluded:

Chaney has consistently maintained that they were the employer of Windsor throughout the pendency of the Workers' Compensation proceedings.

There is enough facts in the record to find that estoppel, or in the alternative waiver of the rights by Chaney—waiver of the rights by Chaney for failure to assert their rights timely.

After considering all the evidence in this case, and the arguments of counsel, this court is not convinced by a preponderance of the evidence that the decision of the Workers' Compensation Commission is incorrect. Therefore, the court affirms the decision of the Commission. That is the ruling of this court.

## DISCUSSION

### I.

Chaney acknowledges that, when the accident occurred, it was Windsor's "general employer." However, Chaney contends that Genstar was Windsor's "special employer" at that time, because Chaney had "loaned" Windsor to Genstar; Windsor's work was for the sole benefit of Genstar; Genstar had control over Windsor; and Windsor agreed to the arrangement. On that basis, Chaney claims that it is entitled to indemnification from Genstar for the compensation benefits it has paid. Alternatively, Chaney claims that Genstar is liable as a dual or joint employer. It contends that the WCC erred when, on the grounds of estoppel, it determined that Chaney was Windsor's "correct" employer.

We pause to explain the concepts of "general," "special," and joint employer in the context of a workers' compensation case. "A general employer is an employer who transfers an employee to another employer for a limited period. A special employer is an employer who has borrowed an employee for a limited period and has temporary responsibility and control over the employee's work." *Temporary Staffing, Inc.,* 362 Md. at 392 n. 1, 765 A.2d 602. Moreover, "under certain circumstances, a person performing a given function simultaneously may be the employee of two employers." *Mackall v. Zayre Corp.,* 293 Md. 221, 229, 443 A.2d 98 (1982); *see Great Atlantic & Pacific Tea Company, Inc. v. Imbraguglio,* 346 Md. 573, 591, 697 A.2d 885 (1997); *Whitehead v. Safway Steel Products, Inc.,* 304 Md. 67, 79, 497 A.2d 803 (1985); *Automobile Trade Ass'n. v. Harold Folk Enterprises, Inc.,* 301 Md. 642, 659, 484 A.2d 612 (1984). "Ordinarily, the existence of the employer/employee relationship is a question reserved for the fact finder." *Imbraguglio,* 346 Md. at 590, 697 A.2d 885; *see Lovelace v. Anderson,* 366 Md. 690, 716, 785 A.2d 726 (2001).

Chaney recognizes that the WCC did not expressly resolve the employer/employee issue. But, it contends that the WCC

implicitly found that Genstar was the special employer of Windsor, because it determined that Chaney was "estopped from impleading ... Genstar." Chaney points out that estoppel is an affirmative defense, and "only comes into play once the party to be estopped has met its burden of proof on the remedy sought to be barred by the doctrine." Therefore, Chaney insists that the WCC must have first concluded that Genstar was the special employer, or else it would not have found it necessary to reach the estoppel issue.

Next, Chaney attacks the Commission's estoppel ruling, asserting that there "is no factual premise in the record to support any type of estoppel defense...." In particular, Chaney observes that because it never suggested in any prior legal proceeding that Genstar was not the special employer, the doctrine of judicial estoppel is inapplicable here. Similarly, Chaney claims that equitable estoppel does not apply, because Genstar took no action in reliance on any action by Chaney. And, Chaney claims that the doctrine of collateral estoppel does not govern, because Genstar was not a party to any litigation regarding Windsor's injury. To the contrary, Chaney maintains that the WCC previously considered whether Chaney was Windsor's general employer, but not whether Genstar was Windsor's special employer. If the estoppel ruling was erroneous, we are left, says Chaney, with the Commission's implied ruling that Genstar was Windsor's special employer. According to Chaney, that ruling is now "the law of the case," and we should uphold it.

Alternatively, Chaney suggests that "[t]he meaning of the Commission's order and the resulting Circuit Court appellate decision in that regard is in dispute." It complains, therefore, that the Commission erred in failing to resolve the issue of Genstar's status as an employer, as that was the precise reason for which Chaney filed issues with the WCC. Moreover, Chaney contends that such a determination is "necessary" with respect to its civil suit against Genstar, which has been stayed pending the Commission's resolution of the employer issue. Accordingly, it maintains that the circuit court

should have remanded the matter to the Commission for a determination of Genstar's status.

In addition, Chaney notes that "no one appealed the decision of the Workers' Compensation Commission that Chaney's claim for indemnification is NOT bar[r]ed by the statute of limitations." Accordingly, Chaney suggests that, if its indemnification claim is not barred by limitations, then it is entitled to have the WCC resolve the employer issue.

While recognizing that, as to Windsor's compensation claim, there has been "a final judgment on the merits in a prior litigation," Chaney asserts that there is no basis to conclude that it ever "intentionally relinquished its rights to have Genstar declared a special employer." Rather, Chaney insists that "Genstar's status as an employer was not in issue originally before the Commission," and the only "relevant issue before the Commission was the status of Chaney as Windsor's employer." In contrast, Chaney notes that "the issue in the subsequent proceeding between Genstar and Chaney involves a breach of contract claim and a claim for indemnity." In its view, "a determination that Chaney was Windsor's general employer does not preclude a finding that at the time of the accident, Genstar was Windsor's special employer," because those facts and issues were not litigated in the workers' compensation proceeding.

Genstar counters that, because Chaney failed to appeal the 1995 Commission Order, which determined, in effect, that Chaney was Windsor's sole employer, Chaney is "estopped from denying responsibility for payment of ... benefits." Regarding appellant's assertion that it failed to appeal the WCC's ruling as to the statute of limitations, Genstar contends that it had "no basis for appeal," given that it prevailed below. In this regard, Genstar asserts that "it is the ultimate decision of the Commission *effectively disposing of the case*, not each individual finding, which is the basis for judicial review."

Windsor submits that, "in the context of this appeal," the issues of waiver and estoppel are "one and the same." While recognizing that the Commission did not expressly "use the

words 'waived its right to raise the issue,' " Windsor argues that the WCC correctly found, in effect, that Chaney waived its claim against Genstar and was estopped from impleading Genstar.

## II.

The Maryland Workers' Compensation Act (the "Act"), codified in Title 9 of the Labor and Employment Article ("L.E.") of the Maryland Code (1991, 1999 Repl.Vol.), entitles covered employees to recover compensation benefits, without regard to fault, for an occupational disease or an accidental injury that arises out of and in the course of employment. *See* L.E. §§ 9–101(b), 9–501, 9–502. *See Livering v. Richardson's Restaurant*, 374 Md. 566, 573–74, 823 A.2d 687 (2003); *Means v. Baltimore County*, 344 Md. 661, 664, 689 A.2d 1238 (1997); *Mayor and City Council of Baltimore v. Johnson*, 156 Md. App. 569, 576, 847 A.2d 1190 (2004). Compensation is made "for the loss of earning capacity resulting from accidental injury, disease, or death occurring during the course of employment." *Philip Electronics North America v. Wright*, 348 Md. 209, 215–16, 703 A.2d 150 (1997); *see Ametek v. O'Connor*, 364 Md. 143, 154, 771 A.2d 1072 (2001); *DeBusk v. Johns Hopkins Hosp.*, 342 Md. 432, 437, 677 A.2d 73 (1996).

The Act constitutes a " 'comprehensive scheme to ... provide sure and certain relief for injured [workers], their families and dependents regardless of questions of fault.' " *Hastings v. Mechalske*, 336 Md. 663, 672, 650 A.2d 274 (1994) (citations omitted); *see Breitenbach v. N.B. Handy Co.*, 366 Md. 467, 474, 784 A.2d 569 (2001); *Waters v. Pleasant Manor Nursing Home*, 361 Md. 82, 104, 760 A.2d 663 (2000). As the Court of Appeals recently reiterated, "[t]he Act essentially is remedial, social legislation designed to protect workers and their families from various hardships that result from employment-related injuries." *Livering*, 374 Md. at 574, 823 A.2d 687; *see Martin v. Beverage Capital Corp.*, 353 Md. 388, 398, 726 A.2d 728 (1999).

■ Pursuant to L.E. § 9–509(a), compensation under the Act is ordinarily an injured employee's exclusive remedy with respect to the employer. *Imbraguglio,* 346 Md. at 578, 697 A.2d 885. "Compensation awarded on this fault-free basis under the statutory plan substitutes for an employee's common law right to bring a fault-based tort suit against an employer for damages resulting from the employee's injury . . . ." *DeBusk,* 342 Md. at 438, 677 A.2d 73; *see Belcher v. T. Rowe Price Foundation, Inc.,* 329 Md. 709, 736, 621 A.2d 872 (1993). The *"quid pro quo"* for compensation to an employee, unrelated to fault, is that employers are "relieved of the prospect of large damage verdicts." Arthur Larson, *Larson's Workers' Compensation Law* (2000), § 100.01, at 100–2–3 (*"Larson's"*); *see Imbraguglio,* 346 Md. at 578, 697 A.2d 885; *Hastings,* 336 Md. at 672, 650 A.2d 274. In this way, employers avoid "the disruption of business by burdensome lawsuits." *Central GMC, Inc. v. Lagana,* 120 Md.App. 195, 204, 706 A.2d 639, *cert. granted,* 350 Md. 280, 711 A.2d 871, *appeal dismissed,* 351 Md. 160, 717 A.2d 384 (1998).

Although the Act is "remedial in nature," and " 'should be construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes,' " *Philip Electronics, supra,* 348 Md. at 216, 703 A.2d 150 (citation omitted), "the Act has a purpose broader than serving the interests of employers and their employees . . . The needs and expectations of society, in addition to those of the work force, come into play." *Belcher,* 329 Md. at 737, 621 A.2d 872. As the Court of Appeals has said, "the Act protects employees, employers, and the public alike." *Polomski v. Mayor and City Council of Baltimore,* 344 Md. 70, 76, 684 A.2d 1338 (1996); *see Waters,* 361 Md. at 104, 760 A.2d 663.

Recovery pursuant to the Act is ordinarily an employee's "sole recourse" as against an employer. *Imbraguglio,* 346 Md. at 578, 697 A.2d 885. But, under certain circumstances, the Act preserves the rights of the employee, the employer, and the insurer to sue for damages. Accordingly, we next

**18**

consider the statutory scheme with respect to third party tortfeasors.

When a worker sustains an injury arising out of and in the course of employment, but which was caused by the negligence of a third party, L.E. § 9–902 expressly provides the injured employee with the option of either: 1) filing a compensation claim against the employer to recover benefits under the Act, or 2) instituting an action for damages against the tortfeasor.[6] *Imbraguglio,* 346 Md. at 583–84, 697 A.2d 885; *Saadeh v. Saadeh, Inc.,* 150 Md.App. 305, 312, 819 A.2d 1158, *cert. denied,* 376 Md. 52, 827 A.2d 114 (2003). Although an employee is not entitled to collect a double recovery, the Act "neither excuses third-parties from their own negligence nor limits their liability." *Imbraguglio,* 346 Md. at 583, 697 A.2d 885.

Under L.E. § 9–902(a), a self-insured employer, or the employer's insurer, is permitted to sue a third party whose tortious conduct causes an employee's injuries, in order "to recoup from the tort-feasor the compensation it has paid." *Saadeh,* 150 Md.App. at 314, 819 A.2d 1158; *see Podgurski v. OneBeacon Insurance Co.,* 374 Md. 133, 139–140, 821 A.2d 400 (2003). Indeed, if an employee elects to receive compensation benefits as a result of an injury caused by a third party, then the employer has the exclusive right to bring a tort action against a third party for a period of two months following the award of compensation benefits to the employee. L.E. § 9–902(c); *see Franch v. Ankney,* 341 Md. 350, 357–58, 670 A.2d 951 (1996); *Podgurski,* 374 Md. at 140, 821 A.2d 400; *Erie Ins. Co. v. Curtis,* 330 Md. 160, 164, 623 A.2d 184 (1993); *Saadeh,* 150 Md.App. at 313, 819 A.2d 1158. But, L.E. § 9–902(b) requires the insurer or employer to pay any "excess" recovery to the claimant. *See Podgurski,* 374 Md. at 140, 821 A.2d 400; *Saadeh,* 150 Md.App. at 313, 819 A.2d 1158.

---

**6.** An employee may also pursue a civil action against an employer if the employee's injury is the result of the deliberate intention of the employer. *See* L.E. § 9–509(d). This provision has no bearing on the case *sub judice.*

■ If the employee opts to recover compensation benefits under the Act, even though the injury was caused by a third party, and the employer fails to file suit against the tortfeasor in the two-month exclusivity period, then the employee may also file suit against the third-party tortfeasor, despite having accepted compensation benefits. *Podgurski*, 374 Md. at 140, 821 A.2d 400. In that event, "the employer retains a subrogation interest in the reimbursement of the workers' compensation funds it paid pursuant to the Act...." *Id. See Imbraguglio*, 346 Md. at 584, 697 A.2d 885; *Collins v. United Pacific Ins. Co.*, 315 Md. 141, 145, 553 A.2d 707 (1989) (interpreting predecessor statute). This is because the employer's interest "acts as a 'statutory lien' on any recovery the employee may obtain from the third party." *Franch*, 341 Md. at 358, 670 A.2d 951.

Several statutory provisions are particularly relevant to our analysis. We pause to review them.

L.E. § 9–707 requires an employer to submit an employer's report to the Commission when an employee loses more than three days of work because of an accidental work related injury. Cornblatt, Meredith, and Sevel, *Workers' Compensation Manual* (11th Ed.2003), at 39 (*"Manual"*). The report must contain all "relevant and necessary" information for the determination of a claim. *See Howard County Association for Retarded Citizens, Inc. v. Walls*, 288 Md. 526, 531, 418 A.2d 1210 (1980). L.E. § 9–707 states, in part:

### § 9–707. Report by employer to Commission.

(a) *Accidental personal injury.*—If an accidental personal injury causes disability for more than 3 days or death, the employer shall report the accidental personal injury and the disability or death to the Commission within 10 days after receiving oral or written notice of the disability or death.

\* \* \*

(c) *Contents of report.*—Each report under subsection (a) or (b) of this section shall state:

(1) whether the accidental personal injury or occupational disease arose out of and in the course of employment;

(2) the time, cause, and nature of the disability and the accidental personal injury or occupational disease;

(3) the probable duration of the disability; and

(4) any other information that the Commission may require by regulation.

L.E. § 9–709 requires the claimant to file an application for benefits within sixty days of the accident. The Commission then "establishes a 'consideration date,' which notifies the employer/insurer that the Commission will pass an award based on the evidence in the claim file unless the Commission is notified of the employer/insurer's desire to contest the case on specific grounds or issues." *Manual*, at 41; *see* Gilbert and Humphreys, *Maryland Workers' Compensation Handbook* (2nd ed.), at 295 ("*Handbook*").

When an employee files a compensation claim with the WCC, L.E. § 9–713 requires the employer either to begin payment of benefits, or to file issues contesting the claim, within twenty-one days after the employee's filing of the claim. "The filing of issues constitutes a request for a hearing before the Commission." *Manual*, at 42. Under L.E. § 9–713(f), payment of benefits *prior to an award* of benefits is not a waiver of an employer's right "to contest the claim." L.E. § 9–713 provides:

### § 9–713. Payment of benefits or filing of issues.

(a) *Payment or filing within 21 days.*—Except as provided in subsection (c) of this section, within 21 days after a claim is filed with the Commission, the employer or its insurer shall:

(1) begin paying temporary total disability benefits; or

(2) *file with the Commission any issue to contest the claim.*

(b) *Failure to pay or file within 21 days—Penalties.*—If the Commission finds that an employer or insurer has failed, without good cause, to begin paying temporary total

disability benefits or to file issues contesting a claim within 21 days after the claim is filed, the Commission may assess against the employer or insurer a fine not exceeding 20% of the amount of the payment.

(c) *Payment or filing within 30 days.*—If the employer or its insurer does not begin paying benefits or file issues within 21 days under subsection (a) of this section, within 30 days after the claim is filed with the Commission, the employer or its insurer shall:

(1) begin paying temporary total disability benefits; or

(2) file with the Commission any issue to contest the claim.

(d) *Failure to pay or file within 30 days—Penalties.*—If the Commission finds that an employer or insurer has failed, without good cause, to begin paying temporary total disability benefits or to file issues contesting a claim within 30 days after the claim is filed, the Commission may assess against the employer or insurer a fine not exceeding 40% of the payment.

(e) *Payment to covered employee.*—The Commission shall order the employer or insurer to pay a fine assessed under this section to the covered employee.

(f) *Payment of benefits not waiver.*—Subject to § 9–714 of this subtitle, *payment by an employer or its insurer before an award does not waive the right of the employer or its insurer to contest the claim.*

(Emphasis added).

Pursuant to L.E. § 9–714, the Commission makes an award within thirty days after the filing of a claim, if the claim is uncontested. But, if a hearing is held, any award must await the results of the hearing. In this case, no hearing was requested and none was held. The WCC issued its award to Windsor on July 18, 1995, requiring Chaney and its Insurer to pay benefits to Windsor. Although "[a]n initial award of compensation is a final appealable order," *Handbook*, at 297, no appeal was taken from the Order of July 18, 1995.

L.E. §§ 9–714 and 9–715 pertain to the WCC's power to investigate a claim. They state:

### § 9–714. Claim processing.

(a) *Investigation; hearing.*—When the Commission receives a claim, the Commission:

(1) may investigate the claim; and

(2) on application of any party to the claim, shall order a hearing.

(b) *Determination.*—(1) The Commission shall make or deny an award within 30 days:

(i) after the claim is filed; or

(ii) if a hearing is held, after the hearing is concluded.

(2) The decision shall be recorded in the principal office of the Commission, and a copy of the decision shall be sent by first class mail to each party's attorney of record or, if the party is unrepresented, to the party.

### § 9–715. Conduct of investigations.

(a) *In general.*—The Commission may conduct an investigation in the manner that the Commission finds best to:

(1) determine the substantial rights of each party; and

(2) carry out justly the spirit of this title.

(b) *Rules of evidence and procedure.*—Except as otherwise provided in this title, the Commission is not bound by:

(1) any common law or statutory rule of evidence; or

(2) any formal or technical rule of procedure.

As we observed earlier, L.E. § 9–901 permits an employee who is injured as a result of the negligence of a third party to bring suit against the third party, or proceed under the Act and then sue the third party. *See Handbook,* at 308. Under L.E. § 9–903, if the claimant sues a third party in tort, but the claim for damages yields an award less than what the worker would have received under the Act, the worker retains the right to seek to "reopen the claim for compensation," in order to recover an amount equal to what the injured employee would have received in compensation had he or she proceeded under the Act. As a result, the worker need not suffer the

consequence of a "bad guess" as to the appropriate course of action, and does not risk losing all benefits under the Act, "in the event of a choice which proves to have been unwise." *Larson's,* § 115, at 115–1. L.E. § 9–903 provides:

### § 9–903. Effect of receipt of amount in action.

(a) *In general.*—Except as provided in subsection (b) of this section, if a covered employee or the dependents of a covered employee receive an amount in an action:

(1) the amount is in place of any award that otherwise could be made under this title; and

(2) the case is finally closed and settled.

(b) *Exception.*—If the amount of damages received by the covered employee or the dependents of the covered employee is less than the amount that the covered employee or dependents would otherwise be entitled to receive under this title, the covered employee or dependents may reopen the claim for compensation to recover the difference between:

(1) the amount of damages received by the covered employee or dependents; and

(2) the full amount of compensation that otherwise would be payable under this title.

L.E. § 9–902 allows a self-insured employer or an insurer to sue a third party tortfeasor to recover compensation benefits paid on behalf of a claimant. It states:

### § 9–902. Action against third party after award or payment of compensation.

(a) *Action by self-insured employer, insurer, or fund.*—If a claim is filed and compensation is awarded or paid under this title, a self-insured employer, an insurer, the Subsequent Injury Fund, or the Uninsured Employers' Fund may bring an action for damages against the third party who is liable for the injury or death of the covered employee.

(b) *Recovery of damages exceeding compensation and other payments.*—If the self-insured employer, insurer, Subsequent Injury Fund, or Uninsured Employers' Fund

recovers damages exceeding the amount of compensation paid or awarded and the amount of payments for medical services, funeral expenses, or any other purpose under Subtitle 6 of this title, the self-insured employer, insurer, Subsequent Injury Fund, or Uninsured Employers' Fund shall:

(1) deduct from the excess amount its costs and expenses for the action; and

(2) pay the balance of the excess amount to the covered employee or, in case of death, the dependents of the covered employee.

(c) *Action by covered employee or dependents.*—If the self-insured employer, insurer, Subsequent Injury Fund, or Uninsured Employers' Fund does not bring an action against the third party within 2 months after the Commission makes an award, the covered employee may bring an action for damages against the third party.

(d) *Limitations period.*—The period of limitations for the right of action of a covered employee or the dependents of the covered employee against the third party does not begin to run until 2 months after the fist award of compensation made to the covered employee or the dependents under this title.

(e) *Distribution of damages.*—If the covered employee or the dependents of the covered employee recover damages, the covered employee or dependents:

(1) first, may deduct the costs and expenses of the covered employee or dependents for the action;

(2) next, shall reimburse the self-insured employer, insurer, Subsequent Injury Fund, or Uninsured Employers' Fund for:

(i) the compensation already paid or awarded; and

(ii) any amounts paid for medical services, funeral expenses, or any other purpose under Subtitle 6 of this title; . . . .

Code of Maryland Regulations ("COMAR") 14.09.01.08 permits a party to implead an alleged co-employer in a compensa-

tion case. It provides: "Claim Against Statutory Employer or Co-employer. A party may join a person designated by statute as an employer *or alleged to be a co-employer* by notifying the Commission in writing of the person's correct name and address." (Emphasis added).

The Commission's decision carries a prima facie presumption of correctness. L.E. § 9–745(b); *Martin,* 353 Md. at 402, 726 A.2d 728; *Gleneagles, Inc. v. Hanks,* 156 Md.App. 543, 550, 847 A.2d 520, slip op. at 7 (2004). Nevertheless, "a reviewing court has broad authority and may reverse the Commission's decision when it is based on an erroneous conception of the law." *Board of County Comm'rs v. Vache,* 349 Md. 526, 537, 709 A.2d 155 (1998); *see Mona Elec. Services, Inc. v. Shelton,* 148 Md.App. 1, 5, 810 A.2d 1022 (2002); *Henville v. Southwest Airlines, Inc.,* 142 Md.App. 79, 86, 788 A.2d 210 (2002).

## III.

We consider the statutory scheme outlined above in light of the canons of statutory construction. The interpretation of a statute is a judicial function. *Muhl v. Magan,* 313 Md. 462, 481–82, 545 A.2d 1321 (1988). Our goal is to "ascertain and effectuate legislative intent." *Consolidated Constr. Servs., Inc. v. Simpson,* 372 Md. 434, 456, 813 A.2d 260 (2002); *see Liverpool v. Baltimore Diamond Exchange, Inc.,* 369 Md. 304, 316, 799 A.2d 1264 (2002); *Mayor & City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987 (2000).

Generally, we give the words of the statute their "ordinary and common meaning within the context in which they are used." *Polomski,* 344 Md. at 75, 684 A.2d 1338. To the extent "reasonably possible," we read a statute so "that no word, phrase, clause, or sentence is rendered surplusage or meaningless." *Mazor v. State Dep't of Correction,* 279 Md. 355, 360, 369 A.2d 82 (1977); *see Eng'g Mgmt. Servs., Inc. v. Md. State Highway Admin.,* 375 Md. 211, 224, 825 A.2d 966 (2003); *Motor Vehicle Admin. v. Lytle,* 374 Md. 37, 61–2, 821 A.2d 62 (2003). To effectuate the legislative intent, we may

consider " 'the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.' " *Chesapeake Charter, Inc. v. Anne Arundel County Bd. of Educ.*, 358 Md. 129, 135, 747 A.2d 625 (2000) (citation omitted). But, "absurd results" in the interpretation of a statute "are to be shunned." *Mayor & Council of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 550, 814 A.2d 469 (2002).

When, as here, a statutory provision is part of a statutory scheme, " 'all sections of the Act must be read together . . . to discern the true intent of the legislature.' " *Breitenbach*, 366 Md. at 472, 784 A.2d 569 (citation omitted); *see Vest v. Giant Food Stores, Inc.*, 329 Md. 461, 466–67, 620 A.2d 340 (1993); *Ball v. Univ. of Maryland*, 137 Md.App. 229, 232, 768 A.2d 105 (2001); *Buskirk v. C.J. Langenfelder & Son, Inc.*, 136 Md.App. 261, 269, 764 A.2d 857 (2001). We do not examine the provisions of such a statute as if they are "isolated, independent sections." *Waters*, 361 Md. at 104, 760 A.2d 663.

As noted, the Act was conceived to protect workers and their families, " 'based largely on a social theory of providing support and preventing destitution, rather than settling accounts . . . according to . . . blame.' " *Belcher*, 329 Md. at 736, 621 A.2d 872 (citation omitted). *See Waters*, 361 Md. at 104, 760 A.2d 663; *Martin*, 353 Md. at 398, 726 A.2d 728. Because the Act's "core values . . . have never been abandoned," *Polomski*, 344 Md. at 76, 684 A.2d 1338, the "benevolent objective of workers' compensation statutes is the polar principle in determining the rights of the parties." *Central GMC, Inc.*, 120 Md.App. at 205, 706 A.2d 639. Indeed, in L.E. § 9–102(b), the Legislature expressly rendered inapplicable the general rule that "a statute in derogation of the common law is to be strictly construed. . . ." Therefore, we construe the Act "as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes." *Bethlehem–Sparrows Point Shipyard, Inc. v. Hempfield*, 206 Md. 589, 594, 112 A.2d 488 (1955); *see Engel & Engel, P.A. v. Ingerman*, 353 Md. 43, 51, 724 A.2d 645 (1999); *Keystone*

*Masonry Corp. v. Hernandez,* 156 Md.App. 496, 513, 847 A.2d 493 (2004).

■ Ambiguities or uncertainties in the Act are generally resolved in favor of a claimant, consistent with the statutory purpose. *Ametek,* 364 Md. at 154, 771 A.2d 1072; *Philip Electronics,* 348 Md. at 217, 703 A.2d 150; *Para v. Richards Group of Washington Ltd. Partnership,* 339 Md. 241, 252, 661 A.2d 737 (1995); *Mayor & City Council of Baltimore v. Cassidy,* 338 Md. 88, 97, 656 A.2d 757 (1995). In this regard, "[w]e may . . . consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore, Inc. v. Department of Employment & Training,* 309 Md. 28, 40, 522 A.2d 382 (1987). However, as the Court acknowledged in *Podgurski,* 374 Md. at 143, 821 A.2d 400, the Court "does not apply a liberal construction axiom where it is in opposition to the plain meaning of a statute." This is because "the benevolent purposes of the Act are met when a covered employee receives all the benefits to which she is entitled under the Act. They extend no further." *Id.* at 143, 821 A.2d 400.

■ Moreover, we " 'may not create ambiguity or uncertainty in the Act's provisions where none exists so that a provision may be interpreted in favor of the injured claimant.' " *Ametek,* 364 Md. at 155, 771 A.2d 1072 (citation omitted). Nor may we add or delete words so as " 'to give the statute a meaning not otherwise communicated by the language used.' " *Harris v. Board of Educ. of Howard County,* 375 Md. 21, 31, 825 A.2d 365 (2003) (citation omitted); *see Johnson,* 156 Md.App. at 595, 847 A.2d 1190; *Clarence W. Gosnell, Inc. v. Hensley,* 156 Md.App. 224, 236, 846 A.2d 469 (2004). And, we may not extend coverage "beyond that which is authorized by the provisions of the Act." *Barnes v. Children's Hospital,* 109 Md.App. 543, 554, 675 A.2d 558 (1996); *see Engel,* 353 Md. at 55, 724 A.2d 645 (discussing attorneys' fees in workers' compensation cases and stating that, when " 'the language of the statute is plain and clear and expresses

a meaning consistent with the statute's apparent purpose, no further analysis is ordinarily required.' ") (Citation omitted).

With this understanding of the Act and the principles of statutory construction, we turn to consider Chaney's contentions.

## IV.

We shall not be detained by Chaney's contention that, because the WCC relied on estoppel, it implicitly ruled that Genstar was a special employer. There are many cases, civil and criminal, in which a court decides a particular issue because it is dispositive, and obviates the need for the court to address issues that might otherwise be regarded as threshold questions. Merely because the agency chose to address first the issue of estoppel does not mean that it impliedly decided any other issues. To illustrate, a court might first consider whether a party waived a contention, because a determination of waiver obviates the need for the court to reach the merits. Such a ruling cannot be construed as an implied finding by the court that the claim must have had merit, or else the court would not have found that the claim was waived. In the same way, it is completely unreasonable for Chaney to infer from the WCC's finding of estoppel that the Commission otherwise agreed with Chaney that Genstar was a special or joint employer.

## V.

Appellant complains, alternatively, that the WCC erroneously found estoppel, and failed to determine whether Genstar was a special or joint employer. We agree that, in the ordinary course, it is the Commission's responsibility to resolve any issue concerning the identity of the correct employer with respect to a work related accident. Indeed, that is why it is difficult to overlook Chaney's failure to ask the Commission to do so until six years after the accident. *Temporary Staffing, Inc., supra,* 362 Md. 388, 765 A.2d 602, is instructive.

Temporary Staffing, Inc. ("TSI") sent the claimant, Mr. Jewell, to work at J.J. Haines & Co., Inc. ("Haines"), pursuant to an agreement between the employers. *Id.* at 392, 765 A.2d 602. Jewell was injured on the job, and subsequently filed a compensation claim with the WCC. The Commission determined that Haines was the employer, without considering the parties' contractual agreement as to liability. *Id.* at 392, 765 A.2d 602. On judicial review, the circuit court determined that TSI and Haines were co-employers, and remanded to the WCC for further proceedings. *Id.* The WCC then ruled that "both employers and their insurers were jointly liable in equal shares." *Id.* at 393, 765 A.2d 602. Thereafter, the circuit court concluded that TSI was primarily liable for payment of the award, but that Haines was obligated to provide excess coverage in the event TSI could not fulfill its obligations. *Id.* at 393, 765 A.2d 602.

The Court of Appeals concluded that the circuit court erred by making "factual determinations that should have been remanded to the Commission for its consideration." *Id.* at 393, 765 A.2d 602. As the Court explained, the intent of the Legislature in creating the Commission was to relieve the court system from the burdens of such claims, and to provide a less expensive and more expeditious way for workers to obtain compensation for work related injuries. *Id.* at 404, 765 A.2d 602. To that end, the Commission is entrusted with "the authority to approve claims, reopen cases, *make determinations on employment relationships, determine liability of employers,* award lump sum payments, approve settlements, award fees for legal services, funeral expenses, and medical services." *Id.* at 400, 765 A.2d 602 (emphasis added).

Although the employers and their insurers had "requested that the Commission decide which employer and insurer should be liable for payment to Mr. Jewell," *id.* at 400, 765 A.2d 602, the Commission declined to resolve the issue; it was of the view that " 'interpretation of the contract is beyond [the WCC's] jurisdiction. . . .' " *Id.* In the circuit court, and on appeal, TSI argued that the contract between the employers was not relevant, and "should be litigated in a separate civil

proceeding." *Id.* at 401, 765 A.2d 602. The Court squarely rejected TSI's contention as "contrary to the legislative intent of the Act." *Id.* at 404, 765 A.2d 602. Indeed, mindful of the statutory authority granted to the WCC and the legislative intent, the Court said that "the Commission has the authority to, and should, interpret agreements between general employers and special employers like the one in the case *sub judice.*" *Id.* at 403, 765 A.2d 602. Therefore, the Court ruled that "the Circuit Court . . . erred when it interpreted the agreement between J.J. Haines and TSI instead of remanding the matter to the Commission for its consideration." *Id.* at 396, 765 A.2d 602.

Significantly, the Court stated:

As relevant to the present case, the Commission is granted the power to initially determine whether a specific entity is an employer of an injured worker. *When a possibility of dual or alternate employers exists, the Commission, out of necessity, must determine the extent of each respective employer's liability.* In the performance of that duty, *the Commission, in order to fulfill its obligation, must consider an agreement between employers.*

*Id.* at 399, 765 A.2d 602 (emphasis added). It reasoned:

*When all relevant employers are part of a Commission proceeding that includes the determination of liability between them for workers' compensation benefits and one of the employers alleges that there is an agreement that affected the relationship, the Commission should consider whether an agreement exists and the effect of the agreement. This is in accordance with the intent of the Act.* If a party before the Commission believes that the Commission did not properly apply or interpret the agreement, the party may seek judicial review of the Commission's ruling. *In this manner, all issues can be finally resolved in the one proceeding, without the necessity of multiple suits.*

*Id.* at 404, 765 A.2d 602 (emphasis added).

Accordingly, the Court said:

We hold that the Commission, when considering liability for employee's workers' compensation benefits between co-employers, should interpret and apply any contracts or agreements between the co-employers that validly affects their liability for the payment of such benefits to an entitled worker. This is in accordance with the intent of the Act and the authority granted to the Commission to resolve workers' compensation cases under the Act. *It is also sound judicial policy to resolve all aspects of a case within the same proceeding and not to have a separate proceeding for each aspect of a case.*

*Id.* at 406, 765 A.2d 602 (emphasis added). *See also Oxford Cabinet Co. v. Parks,* 179 Md. 680, 683, 22 A.2d 481 (1941) ("The purpose of the Workman's Compensation Act . . . was . . . that the administration of that law should be withdrawn as much as possible from the courts in order to save the expense and delay of litigation."); *Glidden–Durkee (SCM) Corp. v. Mobay Chemical Corp.,* 61 Md.App. 583, 596, 487 A.2d 1196 (1985) ("This statutory scheme is consistent with the purpose of the Workmen's Compensation Act, to provide simple, speedy and economical procedures consistent with practical justice. . . .").

*Temporary Staffing, Inc.* highlights the serious flaws in the way that Chaney proceeded here. In stark contrast to *Temporary Staffing, Inc.,* when Chaney submitted its report of injury to the WCC, as required by L.E. § 9–707, it never alerted the WCC to its contention that Genstar was a dual employer or Windsor's special employer, despite Chaney's knowledge that Windsor had been loaned to Genstar and the accident occurred at Genstar's premises. Nevertheless, L.E. § 9–707(c), which governs the contents of the employer's report, provides that it "shall" include whether the injury "arose out of and in the course of employment." The word "shall" is generally understood as mandatory. *See Wyatt v. Johnson,* 103 Md.App. 250, 259–60, 653 A.2d 496 (1995) (stating that "shall" connotes a mandatory intent unless the context suggests otherwise). Therefore, if Chaney believed that, at the relevant time, Windsor's injury did not arise out of and

**32**

in the course of Windsor's employment with Chaney, it should have said so.

Moreover, because COMAR 14.09.01.08 specifically allows an employer to join an alleged co-employer in a workers' compensation proceeding, if Chaney considered Genstar a dual or special employer, it should have sought to implead Genstar. And, prior to the award of benefits by the WCC, Chaney failed to file any issues with the WCC to contest the claim, as required by L.E. § 9–713. Yet, if the Commission had been timely alerted to an issue concerning the correct employer, it would have had an opportunity to undertake an investigation, as contemplated by L.E. §§ 9–714 and 9–715.

In our view, Chaney's conduct contravened the important principles of judicial economy that the Act was designed to achieve, as recognized by the Court in *Temporary Staffing, Inc.* As a result of Chaney's course of conduct, "all relevant employers" were not "part of a Commission proceeding that include[d] the determination of liability between them for workers' compensation benefits...." *Temporary Staffing, Inc.*, 362 Md. at 404, 765 A.2d 602. Consequently, and contrary to the intention of the Legislature, all issues in regard to compensation benefits could not be "resolved in one proceeding...." *Id.* Instead, appellant created "the necessity of multiple suits," *id.*, when, almost six years after the accident, it filed suit against Genstar, predicated on the contention that Genstar was Windsor's special or dual employer.

As in *Temporary Staffing, Inc.*, the issue of whether Genstar was a special or joint employer was quintessentially one for the Commission to decide. Yet, the WCC was never asked to resolve the issue within a reasonable time. Chaney has not referred us to any authority that sanctions its course of conduct.

Chaney's course of conduct cannot be attributed to an oversight or a lack of knowledge of the relevant facts. To the contrary, our review of Chaney's report of injury to the WCC, considered in light of the Act as a whole, leads inescapably to the conclusion that Chaney did not promptly ask the Commis-

sion to determine whether Genstar was a special or joint employer, because Chaney anticipated recovery from Genstar through a third party tort action, pursuant to its right of subrogation. Chaney would not have had a right of subrogation if Genstar was found to be a special or joint employer.

The parties have not discussed the significance, if any, of the word "subrogation" on the employer's report to the Commission, but that term undergirds our analysis. As we indicated, Chaney inserted the word *"SUBROGATION"* in its report to the WCC, in the space immediately after it noted that the accident did not occur on Chaney's premises. In a workers' compensation case, the term "subrogation" has legal significance; in our view, Chaney's use of the term "subrogation" constituted an assertion by Chaney that it believed it had a claim for subrogation. In effect, Chaney represented to the WCC that Genstar was a third party tortfeasor, not a joint or special employer, because Chaney could not have had a claim for subrogation if Genstar was a special or joint employer. Conversely, Chaney could only have had a subrogation claim if the accident was the fault of a third party tortfeasor; a special or dual employer is not considered a third party tortfeasor.

It becomes evident that Chaney's use of the term "subrogation" carried legal significance when we consider the statutory scheme. A subrogation claim arises under the Act when an employee suffers a work related injury because of the actions of a third party tortfeasor. Based on subrogation, an employer responsible for payment of workers' compensation payments is permitted to "sue and recover from a negligent third person" for the employer's payment of compensation benefits to the employee. *Unsatisfied Claim & Jud. Fund Bd. v. Salvo,* 231 Md. 262, 264, 189 A.2d 638 (1963); *see also Ametek,* 364 Md. at 158, 771 A.2d 1072; *DeBusk,* 342 Md. at 438, 677 A.2d 73; *Montgomery County v. Valk Mfg. Co.,* 317 Md. 185, 190, 562 A.2d 1246 (1989). In contrast, a work related accident that is not the fault of a third party does not give rise to a subrogation claim.

The Court of Appeals elucidated the principles of subrogation in *Bachmann v. Glazer*, 316 Md. 405, 412–13, 559 A.2d 365 (1989), stating:

> Subrogation is founded upon the equitable powers of the court. It is intended to provide relief against loss and damage to a meritorious creditor who has paid the debt of another. *Milholland v. Tiffany*, 64 Md. 455, 460, 2 A. 831 (1886).... The rationale underlying the doctrine of subrogation is to prevent the party primarily liable on the debt from being unjustly enriched when someone pays his debt. *Security Ins. Co. v. Mangan*, 250 Md. 241, 246–47, 242 A.2d 482 (1968). *See also* 10 S. Williston, *A Treatise on the Law of Contracts* § 1265 at 845 (W. Jaeger 3d ed.1967):
>
>> "The object of subrogation is the prevention of injustice. It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one, who, in justice, equity, and good conscience, should pay it. It is an appropriate means of preventing unjust enrichment...."

\* \* \*

> There are three separate categories of subrogation recognized in Maryland: legal subrogation, conventional subrogation, and statutory subrogation. *Finance Co. of Am. [v. U.S.F. & G. Co.]*, 277 Md. [177, 182, 353 A.2d 249 (1976) ]....
>
> Statutory subrogation arises by act of a legislature.

*See also Podgurski*, 374 Md. at 141, 821 A.2d 400; *Alternatives Unlimited, Inc. v. New Baltimore City Bd. of School Commissioners*, 155 Md.App. 415, 460–61, 843 A.2d 252 (2004)(Subrogation is an equitable remedy that "giv[es] the plaintiff the rights formerly held by another person"); BLACK'S LAW DICTIONARY 1595 (4th ed., 1968) (defining subrogation as "[t]he substitution of one person in the place of another with reference to a lawful claim, demand or right ...; so that he who is substituted succeeds to the rights of the other in

relation to the debt or claim, and its rights, remedies, or securities.").

As we have seen, the right of a self-insured employer or an insurer to pursue subrogation is a key component of the Act. The Act "creates a method for enforcing" the subrogation rights of a self-insured employer or an insurer when an employee's injury is the result of a third party's action. *Saadeh*, 150 Md.App. at 314, 819 A.2d 1158; *see Podgurski*, 374 Md. at 140–41, 821 A.2d 400; *Erie*, 330 Md. at 164, 623 A.2d 184. In particular, L.E. § 9–902(a) expressly authorizes a self-insured employer or an insurer to file suit against a third party who may be liable in tort for the worker's injury, for the purpose of recovering the compensation benefits paid to the employee pursuant to the Act. *Podgurski*, 374 Md. at 140, 821 A.2d 400. Indeed, for a period of two months following the Commission's award of benefits to the employee, the employer/insurer "has the exclusive right to bring such an action against the third party." *Id.; see Franch*, 341 Md. at 358, 670 A.2d 951.

As noted, Liberty Mutual was Chaney's Insurer. But, according to comments made by Windsor's attorney at the Commission hearing, "Chaney had a self-insurance deductible of $300,000. So the first $300,000 was being paid by Chaney out of pocket. Liberty Mutual then picks up from there. . . ." If Windsor's attorney was correct, Chaney would have been entitled under L.E. § 9–902 to pursue a claim for damages against an alleged third party tortfeasor. Such a claim is grounded on the employer's subrogation interest.

Moreover, as we explained earlier, if an employer fails to pursue a third party tortfeasor within the two-month period of exclusivity, the Act permits the employee to sue the third party tortfeasor. But, even if an employee recovers damages from a third party tortfeasor, the employer/insurer is entitled "to obtain reimbursement for its workers' compensation payments from the proceeds." *Franch*, 341 Md. at 358, 670 A.2d 951; *see* L.E. § 9–902(e). This is because the employer/insurer "retains *a subrogation interest* in the reimbursement of the

workers' compensation funds it paid pursuant to the Act. . . ."
*Podgurski,* 374 Md. at 140, 821 A.2d 400 (emphasis added).

*Podgurski,* 374 Md. 133, 821 A.2d 400, is instructive. Ms. Podgurski was injured while working at a hair salon located within a department store. *Id.* at 138, 821 A.2d 400. The salon was insured by OneBeacon Insurance Co., which paid workers' compensation benefits. *Id.* As a result of her suit against the department store, Ms. Podgurski recovered an amount that exceeded her workers' compensation benefits. *Id.* at 136, 821 A.2d 400. But, she challenged the insurer's claim that it was entitled to reimbursement from the tort award for the compensation benefits it had paid. *Id.* The Court held that the language of L.E. § 9–902(e)(2) controlled, and unambiguously required the employee to reimburse the employer or the insurer for the workers' compensation payments it had made. *Id.* at 149, 821 A.2d 400. The Court said, *id.* at 144, 821 A.2d 400:

> We hold that the plain language of § 9–902(e) is clear and unambiguous on its face; any argument that it is ambiguous is without merit. Once an employee *recovers damages* from a third party tort-feasor and deducts the proper costs and expenses, that employee *shall reimburse* the insurer or employer for the *compensation already paid or awarded* by the insurer as an award under the Act. The definitions of these italicized words from § 9–902 are patent. The Legislature provided no room or circumstance for instituting a limitation or exception permitting, once third party reimbursement is obtained, a reduction or total bar of the reimbursement amount.

The Court's analysis was rooted in the subrogation rights of the employer or insurer. It reasoned:

> This history and relative stability of the language granting subrogation rights to an employer under this act are supportive of our plain language analysis in the case at bar. First, as previously mentioned, the Legislature originally made the employee choose between exercising the right to sue the third party or the right to file a claim under the Act,

only to later amend the statute so that *the employer has the exclusive right to file the action against the third party tort-feasor for two months after compensation is awarded to the employee.* The employer was guaranteed recovery of its payment before the employee was able to recoup any funds above and beyond the workers' compensation award.[ ] *This illustrates a legislative intent to ensure that a neutral party, the employer, is not made to pay for damages caused by the actual at-fault party. The statute protects both the employee and the employer by allowing the employee to collect compensation from the employer where the third party cannot pay the amount of damages covered by the Act, while allowing the employer to come out even where the third party can pay that amount. As this Court has long held, the purpose of the statute is to protect both the employee and the employer by ensuring that a third party tort-feasor will not escape liability by having another pay its debt. See Johnson v. Miles,* 188 Md. 455, 460, 53 A.2d 30, 32 (1947).

*Id.* at 147–48, 821 A.2d 400 (footnote omitted).

As the Court observed, "it was the Legislature's intent under this statute to ensure full reimbursement to the employer/insurer." *Id.* at 149, 821 A.2d 400. The Court recognized the "long standing proposition that § 9–902 and its predecessors contemplate that the employer is entitled to a *full reimbursement* of the award *it pays under the Act when the employee receives damages in excess of that award from a third party tort-feasor." Id.* at 150, 821 A.2d 400. The Court said, *id.:*

As the relevant language of § 9–902(e) of the Labor and Employment Article of the Maryland Code, and, prior to its codification, that of Article 101 § 58, have been substantively unchanged for over 80 years, cases that have interpreted prior versions of this section of the code are instructive. While the specific issue in the case *sub judice* is one of first impression in this Court, our case law interpreting the nearly identical ancestral language provides additional support that the plain meaning of the language of § 9–902(e),

and its predecessors, require reimbursement in full to the employer/insurer.

Clearly, then, Chaney's use of the term "subrogation" was not inadvertent; it constituted an assertion by Chaney that it believed it was entitled, as the compensation payer, to obtain reimbursement from a third party tortfeasor, by way of subrogation, for its compensation payments. Put another way, when Chaney used the word "subrogation" in its report to the WCC, it made a representation to the WCC that, as the compensation payer, it would be seeking to recover from a third party tortfeasor. This compels the conclusion that Chaney regarded Genstar as a third party tortfeasor, because Chaney would not have had any subrogation rights as to Genstar if Genstar was a special or dual employer.

Moreover, Chaney's course of conduct in failing to file any issues to contest the claim; in failing to request a hearing; and in failing to note an appeal from the award of benefits, lends support to our conclusion that Chaney regarded Genstar as a third party tortfeasor, rather than a special or joint employer. Chaney's conduct, viewed in its entirety, was entirely consistent with its representation to the WCC that it had a subrogation claim against a third party tortfeasor.

This conclusion requires us to analyze the doctrine of "estoppel," which was the basis on which the Commission ruled that Chaney was the "correct employer," and was barred from pursuing its special employer claim against Genstar. Although the Commission did not identify the particular form of estoppel on which it relied, we shall focus on judicial estoppel.

■■■ Chaney asserts, *inter alia*, that it "is not judicially estopped from asserting that Genstar was a special employer and/or joint employer of Windsor [because] Chaney has not **successfully pursued** a position that Genstar was not Windsor's special employer at the time of the accident **in any prior legal proceeding**." In addition, Chaney claims that, even if it "advanced a position that it was Windsor's general employer, that position is not inconsistent with a position that Genstar was Windsor's special employer." We disagree with Chaney.

As we see it, the WCC correctly found that Chaney's belated assertion of a special employer claim was barred under the doctrine of estoppel; its use of the term "estoppel" encompassed judicial estoppel.[7] We explain.

"Maryland has long recognized the doctrine of estoppel by admission, derived from the rule laid down by the English

7. In asserting that judicial estoppel does not apply here, Chaney has not claimed that the doctrine is inapplicable because the matter originated in an administrative proceeding. Although we have not found a Maryland case that is pertinent, numerous jurisdictions have recognized that the doctrine of judicial estoppel applies to administrative proceedings. *See, e.g., King v. Herbert J. Thomas Memorial Hosp.*, 159 F.3d 192, 196 (4th Cir.1998) (stating that the doctrine of judicial estoppel has three elements, including: "The party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior judicial *or administrative proceeding* .... ") (emphasis added); *Simon v. Safelite Glass Corp.*, 128 F.3d 68, 72 (2nd Cir.1997) ("Numerous decisions have approved the application of judicial estoppel where the prior statements were made in administrative or quasi-judicial proceedings."); *Portela–Gonzalez v. Sec'y. of the Navy*, 109 F.3d 74, 78 (1st Cir.1997) ("[A] party cannot take one position in an underlying administrative proceeding and then disclaim it in a subsequent suit arising out of the agency proceedings."); *Chaveriat v. Williams Pipe Line Co.* 11 F.3d 1420, 1427 (7th Cir.1993)("[T]he doctrine [of judicial estoppel] has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate in a subsequent judicial proceeding."); *Alabama v. Shalala*, 124 F.Supp.2d 1250, 1266 (M.D.Ala.2000)("The doctrine of judicial estoppel applies even where the party made the prior inconsistent statements in an administrative forum."); *Kamont v. West*, 258 F.Supp.2d 495, 499 (S.D.Miss.2003)(concluding that plaintiff was judicially estopped from pursuing her claims with the Equal Employment Opportunity Commission because she failed to disclose such claims in a prior bankruptcy petition requiring her to reveal all known causes of action.); *Barack Ferrazzano Kirschbaum Perlman & Nagelberg v. Loffredi*, 342 Ill.App.3d 453, 277 Ill.Dec. 111, 795 N.E.2d 779, 786–88 (2003)(concluding that, in state court proceeding, clients were judicially estopped from challenging reasonableness of claim of former attorneys for legal fees due and owing in connection with representation before the National Association of Securities Dealers, Inc., when clients previously asked NASD to award legal fees against the defendant in the NASD proceeding, and made no claim that the legal fees of the original lawyers were unnecessary or unreasonable); *In re Pich*, 253 B.R. 562, 569 (Bankr.D.Idaho 2000) ("Debtor [in bankruptcy] is not entitled to now stand on residency in order to claim a homestead [exception] having previously, by his application for rezoning, inherently and necessarily represented [to zoning board in classification proceeding] that no residence was contemplated.").

Court of Exchequer ... that '[a] man shall not be allowed to blow hot and cold, to claim at one time and deny at another.' " *Eagan v. Calhoun,* 347 Md. 72, 87–88, 698 A.2d 1097 (1997) (citation omitted). In *WinMark Ltd. Partnership v. Miles & Stockbridge,* 345 Md. 614, 620, 693 A.2d 824 (1997), the Court said:

> " 'If parties in court were permitted to assume inconsistent positions in the trial of their causes, the usefulness of courts of justice would in most cases be paralyzed; the coercive process of the law, available only between those who consented to its exercise, could be set at naught by all.... It may accordingly be laid down as a broad proposition that one who, without mistake induced by the opposite party, has taken a particular position deliberately in the course of litigation, must act consistently with it; one cannot play fast and loose.' "

(Internal quotations and citations omitted).

This Court's decision in *Gordon v. Posner,* 142 Md.App. 399, 790 A.2d 675, *cert. denied,* 369 Md. 180, 798 A.2d 552 (2002), is illuminating. There, we explained that "[j]udicial estoppel, also known as the 'doctrine against inconsistent positions, and 'estoppel by admission,' prevents 'a party who successfully pursued a position in a prior legal proceeding from asserting a contrary position in a later proceeding.' " *Id.* at 424, 790 A.2d 675 (quoting *Roane v. Washington Co. Hosp.,* 137 Md.App. 582, 592, 769 A.2d 263, *cert. denied,* 364 Md. 463, 773 A.2d 514 (2001)). Elucidating the rationale that undergirds the doctrine of judicial estoppel, Judge Adkins wrote for this Court:

> There are two important reasons for estoppel. First, the doctrine of judicial estoppel "rests upon the principle that a litigant should not be permitted to lead a court to find a fact one way and then contend in another judicial proceeding that the same fact should be found otherwise." ... Judicial estoppel ensures "the 'integrity of the judicial process' by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment[.]' "

*Gordon,* 142 Md.App. at 425, 790 A.2d 675 (alteration in original) (citing *New Hampshire v. Maine,* 532 U.S. 742, 750–51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)).

More recently, in *Middlebrook Tech, LLC v. Moore,* 157 Md.App. 40, 62, 849 A.2d 63 (2004), Judge Deborah Eyler said for this Court:

> Three factors 'typically inform the decision whether to apply' the doctrine of judicial estoppel in a particular case: whether the party's later position is clearly inconsistent with its earlier position; whether the party succeeded in persuading the court in the earlier matter to accept its position, so that judicial acceptance of the contrary position in the later matter would create the perception that one of the courts had been misled; and whether the party seeking to assert the inconsistent position in the later matter would derive an unfair advantage, or would impose an unfair detriment on the other party, from being permitted to do so.

Numerous courts in other jurisdictions have recognized the doctrine of judicial estoppel. *See, e.g., Talavera v. School Bd. of Palm Beach* County, 129 F.3d 1214, 1217 (11th Cir.1997) (recognizing that the doctrine of judicial estoppel " 'is applied to the calculated assertion of divergent sworn positions. The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings.' ") (quoting *McKinnon v. Blue Cross & Blue Shield of Alabama,* 935 F.2d 1187, 1192 (11th Cir.1991)); *Reynolds v. Commissioner of Internal Revenue,* 861 F.2d 469, 472 (6th Cir.1988) ("Courts have used a variety of metaphors to describe the doctrine, characterizing it as a rule against 'playing "fast and loose with the courts,' " ... 'blowing hot and cold as the occasion demands,'... or 'hav[ing] [one's] cake and eat[ing] it too.' ") (citations omitted); *Iowa Utilities Bd. v. FCC,* 219 F.3d 744, 756 (8th Cir.2000) (" 'Th[is] doctrine ... prohibits a party from taking inconsistent positions in the same or related litigation.' ") (citation omitted); *see also Pegram v. Herdrich,* 530 U.S. 211, 227 n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a

case on an argument and then relying on a contradictory argument to prevail in another phase.").

We recognize that "[t]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle...." *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir.1982); *see Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir.1996). Indeed, the Supreme Court has cautioned that there is no "exhaustive formula for determining the applicability of judicial estoppel." *New Hampshire v. Maine*, 532 U.S. at 751, 121 S.Ct. 1808. To the contrary, various "considerations may inform the doctrine's application in specific factual contexts." *Id.; see Vogel v. Touhey*, 151 Md.App. 682, 706–709, 828 A.2d 268 (2003).

We acknowledge that a party is not always foreclosed from asserting a position that is inconsistent with one previously adopted. Judicial estoppel is inapplicable unless the party " ' "had, or was chargeable with, full knowledge of the facts and another will be prejudiced by his action." ' " *Gordon*, 142 Md.App. at 426, 790 A.2d 675 (citations omitted); *see Stone v. Stone*, 230 Md. 248, 253, 186 A.2d 590 (1962); *United Book Press v. Maryland Composition Co., Inc.*, 141 Md.App. 460, 470, 786 A.2d 1 (2001); *Roane*, 137 Md.App. at 592, 769 A.2d 263. In this case, however, there is no question that Chaney was chargeable with knowledge of the fact that Windsor had been "loaned" to Genstar and that the incident occurred at Genstar's premises, while Windsor was working for Genstar. Such knowledge was sufficient to alert Chaney to a special employer claim.

Moreover, as the Court in *Temporary Staffing, Inc.* underscored, it is the Commission's function to resolve issues of employer status in a workers' compensation case. Yet, Chaney never asked the WCC to determine whether Genstar was a special or joint employer until six years after the accident. Rather, Chaney immediately represented to the WCC that it had a subrogation claim. In the context of this case, the term "subrogation" was a shorthand reference for Chaney's position that Genstar was a third party tortfeasor, not a special or dual

employer. Thus, Chaney presented itself to the Commission as Windsor's employer, and the Commission accepted Chaney's position. Accordingly, Chaney's belated attempt in 2001 to characterize Genstar as a special or joint employer represents the assertion of a legal position inconsistent with one previously advanced in a legal proceeding.

In our view, *Mackall v. Zayre, supra,* 293 Md. at 226, 443 A.2d 98, does not compel a different conclusion. There, the Court of Appeals considered whether the principles of res judicata and collateral estoppel barred a company from challenging, in a tort case, its status as an employer of an injured worker, even though the Commission had previously determined that the injured worker was the employee of another company. *Id.* at 222, 443 A.2d 98.

Zayre Corporation operated a chain of department stores, and Alden Millinery leased space in one of Zayre's stores. Mackall, the injured employee, managed the Alden concession in one of Zayre's stores. *Id.* at 222–23, 443 A.2d 98. She was injured when she slipped on a liquid on the floor in the Zayre's store, outside the area leased by Alden. *Id.* at 223, 443 A.2d 98. Mackall filed a claim for workers' compensation, naming "Alden Millinery, c/o Zayre Hampton Mall" as her employer. *Id.* At the workers' compensation hearing, Mackall testified that she was employed by Alden, not Zayre. *Id.* The Commission subsequently ordered Alden and its insurer to pay compensation benefits to Mackall. *Id.*

Thereafter, Mackall filed a tort suit against Zayre, alleging that she was injured due to Zayre's negligence. Zayre claimed it was a co-employer, and thus was immune from suit under the predecessor version of the workers' compensation statute. *Id.* at 223–24, 443 A.2d 98. The issue was submitted to a jury, which determined that Mackall was the employee of both Alden and Zayre. *Id.* at 226, 443 A.2d 98. The Court of Appeals affirmed. *Id.*

On appeal, Mackall argued that, because Zayre and Alden had the same insurer and were represented by the same law firm in the compensation and tort cases, Zayre was a party or

in privity with a party to the workers' compensation proceeding. *Id.* at 227, 443 A.2d 98. Relying on principles of res judicata and collateral estoppel, Mackall argued that Zayre was barred from contesting its status as an employer, because the Commission had already determined that Alden was the employer. *Id.* at 227, 443 A.2d 98. The Court disagreed.

After reviewing the principles of res judicata and collateral estoppel, the Court said, *id.* at 228–29, 443 A.2d 98:

> The relevant issue actually litigated in the workmen's compensation proceeding was Alden's status as an employer and the fact determined there was that Alden was Mackall's employer. Zayre's status as Mackall's employer was not in issue and, therefore, was not determined in the workmen's compensation proceeding. The issue presented in the subsequent tort action was Zayre's status as Mackall's employer, and the fact to be determined there was whether Zayre, as well as Alden, was her employer. Accordingly, under the applicable principle of collateral estoppel, Zayre was not prevented, in the subsequent tort action, from litigating its status as Mackall's employer.

As we see it, this case is factually distinguishable from *Zayre.* In filing suit against Genstar, Windsor did not attempt to foreclose a claim by Genstar that it was a dual employer, even though the WCC had issued an order determining that Chaney was Windsor's employer. Yet, that was what Mackall, the employee, had attempted to do, and it was that course of conduct that the Court rejected. Here, it is Chaney, the employer, who seeks to litigate whether Genstar was a special or joint employer, even though Chaney failed to join Genstar as a party in the compensation proceedings, where this issue should have been resolved.

Because Chaney never contested the compensation claim, the Commission issued an award of July 18, 1995, in which it identified Chaney as the sole employer, and required Chaney and its Insurer to pay benefits to Windsor. The order was immediately appealable, yet no appeal was taken. Chaney's failure to file issues and its failure to note an appeal support

our conclusion that Chaney asserted to the WCC the position that, based on its subrogation rights, Genstar was a third party tortfeasor.

Under all of the circumstances attendant here, Chaney's conduct contravened the principles embodied in the statutory scheme. Its belated filing of issues was tantamount to the assertion of a position contrary to an earlier position that it had taken with the Commission. Moreover, Chaney's belated assertion was detrimental to Genstar, given that Chase, the Genstar foreman at the time of the accident, has since died.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**